No. 21-2977

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

_____

KEVIN LINDKE
*Plaintiff-Appellant*

v.

JAMES R. FREED,
in his official and personal capacities
*Defendants - Appellees*

_____

On Appeal from the United States District Court
for the Eastern District of Michigan – Southern Division
Honorable Mark A. Goldsmith, District Court Judge

_____

**APPELLANT'S POST-REMAND SUPPLEMENTAL BRIEF**

_____

PHILIP L. ELLISON
OUTSIDE LEGAL COUNSEL PLC
530 West Saginaw St
PO Box 107
Hemlock, MI 48626
(989) 642-0055
pellison@olcplc.com

*Attorney for
Appellant Kevin Lindke*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... *ii*

INTRODUCTION ............................................................................. 1

FACTS ........................................................................................ 1

ARGUMENT ................................................................................. 17

RESPONSE TO QUESTIONS ............................................................. 18

    I.    Questions 1 and 2 ................................................................ 18

    II.   Question 3 ........................................................................ 25

    III.  Question 4 ........................................................................ 34

    IV.  Question 5 ........................................................................ 35

RELIEF REQUESTED ..................................................................... 37

CERTIFICATE OF COMPLIANCE ...................................................... 39

CERTIFICATE OF SERVICE ............................................................. 40

DESIGNATION OF RELEVANT
DISTRICT COURT DOCUMENTS ...................................................... 41

# TABLE OF AUTHORITIES

## CASES

*Alabama v. U.S. Army Corps of Eng'rs,*
    424 F.3d 1118 (11th Cir. 2005) ..................................................... 23

*Davison v. Randall,*
    912 F.3d 666 (4th Cir. 2019) ........................................................ 19

*Garnier v. O'Connor-Ratcliff,*
    41 F.4th 1158 (9th Cir. 2022)....................................................... 20

*Knight First Amendment Inst. at Columbia Univ. v. Trump,*
    928 F.3d 226 (2d Cir. 2019)......................................................... 19

*Lane v. Facebook, Inc.,*
    696 F.3d 811 (9th Cir. 2012) .......................................................... 1

*Lindke v. Freed,*
    143 S. Ct. 1780 (2023) ................................................................. 13

*Lindke v. Freed,*
    37 F.4th 1199 (6th Cir. 2022)............................................. 13, 20, 21

*Lindke v. Freed,*
    563 F. Supp. 3d 704 (E.D. Mich. 2021) ........................................ 13

*Lindke v. Freed,*
    601 U.S. 187 (2024) ........................................................... *in passim*

*Packingham v. North Carolina,*
    137 S. Ct. 1730 (2017) ................................................................... 2

*Taylor v. City of Saginaw, Mich.,*
    11 F.4th 483 (6th Cir. 2021)......................................................... 17

*United States v. Houston,*
    792 F.3d 663 (6th Cir. 2015) ....................................................... 17

*United States v. Martin,*
    367 Fed. App'x 584 (6th Cir. 2010) ................................................. 17

STATUTES

42 U.S.C. § 1983 ..................................................................................... 25

SECONDARY SOURCES

Hannah Morrill, *The Kennedy Family Through the Decades*,
    TOWN & COUNTRY, Oct. 8, 2020 *available at*
    https://bit.ly/3ozy0WG ................................................................... 33

Michelle Kraus, *Hillary Clinton Redefines Retail Politics Over Social
    Media*, HUFFINGTON POST, Apr. 25, 2015 *available at*
    https://www.huffpost.com/entry/hillary-clinton-
    redefines_b_7070658 ...................................................................... 4

## INTRODUCTION

When having the power to speak on behalf of the state and actually exercising that power, social media savvy public officials posting on topics relating to their work on their *personal* social media accounts are public actors and therefore can be held liable for violating the First Amendment when deleting disfavored comments or blocking critics. Defendant James Freed, the City Manager of Port Huron, Michigan, did that very thing. *Lindke* rejected this panel's self-adopted standard and created its own. Reversal of the District Court's judgment is warranted and a review anew, after additional needed discovery, is required given the newfound standard.

## FACTS

In 2014, Defendant James Freed was appointed city manager for Port Huron, Michigan. With him came social media. Facebook is a "social network" consisting of an online community to facilitate people, businesses, and institutions finding and forming connections through an exchange of different content. *Lane v. Facebook, Inc.*, 696 F.3d 811, 816 (9th Cir. 2012). Social media platforms like Facebook provide "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard" — by local policymaking friends and foes.

*Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017). Like many other public figures[1] holding public office, Freed has a Facebook "Page" (rather than his Profile) with a username of "*JamesRFreed1.*" **March 26, 2020 Post, RE 28-3, PageID #1154.**

Unless purposely banned, everyone can textually comment on "public" posts on Facebook Pages.[2] Users can also add written "reply"

---

[1] There are two main types of users as to Facebook: the first are individuals who have "Profiles" and the second are "businesses, brands, organizations *and public figures*" who have Facebook "Pages." **What's the Difference, RE 28-2, PageID #1552-1553.** There is a difference. Users of Facebook can "post" or digitally share text, written messages, photographs, videos, or links to other articles or webpages on their respective Profiles (for individuals) or Pages (for businesses, brands, organizations and public figures). **Facebook Posts, RE 28-6, PageID #1157-1411.** As users "post" their text, written messages, photographs, links to articles, and videos, these aggregate within each user's "newsfeed" which creates an ongoing list of activities happening on Facebook Pages and Profiles to permit a user to "see what's going on" or going "viral" on Facebook. **Your Home Page, RE 28-20, PageID #1478** (https://bit.ly/3DypStq).

[2] Comments by users are generally not moderated or pre-approved by Facebook prior to being displayed online, but posts or comments can be removed, in infrequent instances, for not meeting basic "community standards" required by the social media platform as a term of its use. See https://www.facebook.com/communitystandards/. However, unfavorable comments of and regarding government officials, objections to government policies or announcements, and general dissent to ideas or concepts shared in "posts" are not improper uses under Facebook's community standards. *Id.* Notwithstanding, the owner or administrator of a Page can individually self-delete comments/replies made in response to a post on its Page. **How Do I Hide or Delete, RE 28-22, PageID**

comments to prior submitted comments. **How Do I Comment, RE 28-21, PageID #1480.** Users also can "like," "heart," "dislike" (i.e., clicking a thumbs-up sign, heart, or an angry face) or otherwise reply to comments connected to each post.

On the public figure Facebook Page, Freed regularly makes posts for general public dissemination, including things like official policy announcements and official city government communications; highlights of local business, nonprofits, and members of the community from, in, and involving the City of Port Huron for self-promotion; and pithy posts for general humor and enjoyment of the constituents of the City of Port Huron. **Posts, RE 28-6, PageID #1157-1411. A** few examples—



#1481. He or she can also ban particular commenting users. **How Do I Ban Or Unban Someone, RE 28-23, PageID #1482-1483.**

Freed also further crafts his "online" image by using photographs of his family as well as participation with community stakeholders to broadcast to constituents that he, as part of his office, is a wholesome family man and an important member of the community. *Id*. This is not new or unusual (or even improper) in politics. E.g. **Biden Tweet, RE 28-17, PageID #1475** (https://t.co/LjLLIjvP1C, POTUS valentines for First Lady Biden); **Shirkey Tweet, RE 28-18, PageID #1476** (https://t.co/rxslEoKY1b, Michigan's then Senate Majority Leader's grandson winning); **Whitmer Tweet, RE 28-19, PageID #1477** (https://t.co/pUpsYe0UFq, Governor's family dogs). After all, social media is now established and mandatory retail politics.[3]

But social media is not all fun and games; it entails serious business too. Citizens use, access, join, and "follow" Freed's Facebook Page "for city information." **DeWitt Dep., RE 28-7, PageID# 1414.** The public posts made to the Facebook Page—discussing matters of public concern—permits citizens to make related or unrelated "comments," both supportive or judgmental. See, e.g., **March 26, 2020 Post, RE 28-3,**

---

[3] See Michelle Kraus, *Hillary Clinton Redefines Retail Politics Over Social Media*, Huffington Post, Apr. 25, 2015 *available at* https://www.huffpost.com/entry/hillary-clinton-redefines-b_7070658.

**PageID #1154**; see also **Lindke Dep., RE 28-11, PageID #1443.** A great example of confirming a public forum is Freed's post from March 26, 2020. **March 26, 2020 Post, RE 28-3, PageID #1154.** By this example post, Freed was advocating how his local government ("we") supports the Michigan Governor's social-distancing measures imposed because of the COVID-19 crisis and the City's complementary decision for early installation of the community fishing dock that "we" (meaning the government) did for those who wish to "social distance while fishing." *Id*. In response, one user unrelatedly asked if the City of Port Huron will be picking up lawn and leaf bags, to which Freed confirmed the same by replying. *Id.* However, another user relatedly questioned the action of installing the fishing dock and whether it would be furtherance of the social distancing directives in effect in Michigan. *Id.* No reply was offered. *Id.* [4]

When the COVID-19 pandemic hit in spring 2020, Freed turned to an established "public figure" social media account[5] to expand a channel

---

[4] Notwithstanding the somewhat level of informality of the platform, these individuals, like many other commenters, are not the "actual" friends or family of Freed, but rather residents, constituents, and local citizens connected with Port Huron, Michigan.

[5] The "JamesRFreed1" social media account is tied to the local city

of communications with his and government's constituents and began regularly sharing important pandemic information including things like policies he initiated for the City of Port Huron and news articles on public-health measures and statistics. Several are believed, but are not yet confirmed, to be the only place the announcement the City's actions or issued policy was publicly disseminated. E.g. **Administrative**

---

government, and not solely to Freed personally. The public figure "JamesRFreed1" Facebook Page is registered to the City of Port Huron's physical address at city hall ("100 McMorran Blvd, Port Huron, Michigan 48060"), the City's website ("http://www.porthuron.org"), the City's general email address ("CommunityComments@porthuron.org"), and has a designated administrator of James Freed, the City Manager. **JamesRFreed1 Page Profile Information, RE 28-4, PageID #1155**; *see also* **City Manager Webpage, RE 28-14, PageID #1468** (containing link to "JamesRFreed1" Facebook Page). These registration settings, linked to the city government, lack any indicia of private party status for regular users. See **About [Page], RE 1-1, PageID #17** (what normal users see). There is no renouncing label (e.g., this is the personal page of James R. Freed) or an expressed disclaimer. Additionally, the public figure Facebook Page has been set to be "visible to everyone;" however users "cannot contact [the] Page privately"—something one would expect if the account was something personal to Freed. **Page Settings, RE 28-5, PageID #1156.** The official photograph selected by Freed to be associated with the account (but was changed after this lawsuit started) is of Freed while at the elected city commissioners' meeting chambers at city hall and has him wearing his City of Port Huron government lapel pin, just like Congressmen wear while in the Capitol. **March 26, 2020 Post, RE 28-3, PageID #1154**. This is the exact same official government picture as on the City Manager's website. **City Manager Webpage, RE 28-14, PageID #1466.**

**Directives, RE 28-6, PageID #1220, 1222.**

Freed's non-personal posts caught the attention of several concerned citizens, including Marjorie DeWitt, Christine Woodley, Robert Pecar, Janet St. John, and Kevin Lindke, who responded with sharp criticism in the comments section of certain posts. It is undisputed that that he simply deleted unfavorable comments and banned certain users from further commenting when not complimenting or supporting his desired message or viewpoint. **Freed Dep Transcript, RE 23-2, PageID #676** (Freed: "I've read… your allegations that I deleted comments, that I blocked people. I don't dispute that in any way."). Several witnesses testified confirming Freed's concessions.

Marjorie DeWitt, a local individual who works within Port Huron, testified that she was a follower Freed's Facebook Page for city information for "at least a year." **DeWitt Dep., RE 28-7, PageID# 1414.** She explained right after the lockdown had started, she noticed one of Freed's posts regarding Mayor Repp while inside a local diner and her failing to socially distance. *Id.* DeWitt's comment in response to the photograph of the mayor not socially distancing was "good job social distancing, Mayor" as a "kind of a sarcastic remark." *Id.* She confirmed

and knows that her "comment was deleted." *Id*. The comment was made to be "critical" of the Mayor Repp for not following—on more than one occasion—the mandatory health guidelines. *Id.* **at PageID #1415.** DeWitt has a strong interest in the topic because "being around people during this pandemic puts [her] children at risk who are immunocompromised." *Id.* She made the comment hoping the "message would cause change in the way the mayor operated out in public." *Id.* Freed simply deleted it. *Id.* **at PageID #1414.**[6]

Janet St. John is a Facebook user who posted a comment to Freed's Facebook Page. **St. John Dep., RE 28-8, PageID #1419.** She testified that she had serious concerns about a local day care controversy involving a convicted sex offender. *Id.* She was concerned there were no posts by Freed about what was going on and St. John "wanted to know why" not. *Id.* Yet, her comment was deleted. *Id.* **at PageID #1420.**

Angry about that, she added a comment containing a link to an ACLU article about the impropriety of deleting comments in such a forum. *Id.* That comment was deleted too. *Id.* St. John made these

---

[6] DeWitt now does not trust Freed won't simply delete any such message again if she were to make them. **DeWitt Dep., RE 28-7, PageID# 1416.**

comments to make Freed "aware" and "look into it," and "do his job" to fight for the children of the community. **Id.** Instead, her comments were deleted. **Id. at PageID #1421**.

Christine Woodley testified she also made several comments to the Facebook Page. **Woodley Dep., RE 28-9, PageID #1424**. Like others, Woodley commented on the same picture of Mayor Repp not socially distancing in the same local restaurant. **Id.** She also commented several times about Larry Whitcomb, a twice-convicted sex offender, living off the grid in St. Clair County. **Id.** All told, she made eight to ten different comments. **Id. at PageID #1426**. These were all deleted. **Id.** Woodley then posted a link to the ACLU article about how "public officials can't block critics on Facebook." **Id. at PageID #1424.** That too was deleted. **Id. at PageID #1425.**

Robert Pecar also offered testimony that he posted some comments about the right of free speech in response to when comments made by others were being deleted by "whoever was running that page and violating our right to free speech" (which we now know to be Freed). **Pecar Dep., RE 28-10, PageID #1434.** He was attempting to advocate to a government official that "there is no place for censorship in America."

*Id.* **at PageID #1434-1435.** Ironically (and frustratingly), Pecar's comments were deleted and he was banned as a user from Freed's Facebook Page. *Id.* **at 1434 & 1435**. In Pecar's words, Freed "came in and blocked us all, shut down our voice and went on about his merry little way." *Id.* **at 1436.**

Finally, there was Plaintiff Kevin Lindke who also posted four to six comments on the Facebook Page directly questioning the early inaction and inattention of government officials from the City of Port Huron (including Freed and Port Huron Mayor Pauline Repp) regarding the COVID-19 pandemic. **Lindke Dep., RE 28-11, PageID #1445.** Lindke raised a similar concern about Mayor Repp captured in the photograph while she was at a local diner in Port Huron and about the City's COVID-19 response. *Id.* **at PageID #1447, 1448.** This is the post—





James Freed
Mar 19 at 12:07 PM · 🌐

Mayor Repp ordered some takeout for us today before a series of virtual briefings we participating in. Be sure to support our **Downtown Port Huron** smal… See More

👍❤️ Josh Sabo and 84 others     30 Comments · 10 Shares

**Facebook Posts, RE 1-2, PageID #31.**[7] All his comments were deleted.

**Lindke Dep., RE 28-11, PageID #1452.** Lindke was then banned from

---

[7] In discovery, Freed only produced the posts that he made and none of the comments that were associated with the posts. Compare **Administrative Directive Facebook Post, RE 1-2, PageID #36** (screenshot containing comments) with **RE 28-6, PageID #1220** (copy produced by Freed that did not have comments included). Given the function and appearance tests being applied at the start of this case, that was sufficient. But given the new *Lindke* legal and evidentiary standards, additional discovery is now needed, including a subpoena to Meta (the owner of Facebook) for production of the associated and deleted comments. And depending on Freed's actions of deleting his account, any unrecoverable information could be subject to the spoilation rules.

posting or accessing anything further. *Id*.

This was not a one-off by Freed. When the comments and questioning by those connected in various ways with the City of Port Huron were perceived as "too critical" (like those by Lindke, Pecar, Woodley, St. John, and DeWitt), Freed took two general actions. First, he simply deleted the unfavored comments. Second, Freed prohibited (banned) those particular commenting-users from ever posting additional comments to the Facebook Page thereby precluding any further comments critical of the government officials of the City of Port Huron. E.g. **Lindke Dep., RE 28-11, PageID #1454.** He eventually blocked Lindke (and others) from accessing the social media page altogether, which kept certain individuals from accessing or commenting on any part of Freed's page and its posts, regardless of status. Yet, when the comments were not critical, they were left untouched and many times further responded to by Freed himself. E.g. **March 26, 2020 Post, RE 28-3, PageID #1154.**

Thereafter, Lindke sued Freed in federal court under 42 U.S.C. § 1983. Freed was accused of violating the First Amendment rights by 1.) deleting comments and 2.) blocking users like Lindke from the page.

**Compl., RE 1, PageID #13-14.** The District Court (Goldsmith, J.) granted summary judgment to Freed based on a self-created fourteen-factor balancing test. *Lindke v. Freed*, 563 F. Supp. 3d 704, 710-711 (E.D. Mich. 2021). On appeal, this Court affirmed on other totally different grounds when adopting the first-of-its-kind "duty-or-authority" test. *Lindke v. Freed*, 37 F.4th 1199 (6th Cir. 2022). Lindke petitioned for and was granted certiorari relief. *Lindke v. Freed*, 143 S. Ct. 1780 (2023). On March 15, 2024, the U.S. Supreme Court "vacate[d]" this Court's "judgment and remand[ed] the case for further proceedings consistent with [its] opinion." 601 U.S. 187, 204 (2024).

As part of the *Lindke* decision, the Supreme Court explained "a public official who fails to keep personal posts in a clearly designated personal account" now "exposes himself to greater potential liability" given the test it adopted. *Id.* The basic rule has not changed—to prevail on a Section 1983 claim, a plaintiff generally must demonstrate that the defendant's conduct constituted state action. In the unanimous opinion authored by Justice Barrett, the Supreme Court provided the two-step test for mixed use social media accounts like Freed's, holding that that a public official's social media conduct qualifies as state action under §

1983 if the official—1.) possessed actual authority to speak on the State's behalf on the particular matter at issue, and 2.) purported to exercise that authority when speaking in the relevant social media posts. *Id.* at 191. The test is different than those previously applied by this Circuit, other circuits, or even the District Court below in this case.

Under the first prong, *Lindke* reaffirmed the "bedrock requirement that 'the conduct allegedly causing the deprivation of a federal right be fairly attributable to the State.'" *Id.* at 198. Thusly, City Manager Freed must have "actual authority rooted in [1.] written law *or* [2.] longstanding custom to speak for the" government on the matter at hand for state action to exist. *Id.* at 201.

Via the second prong, even if the official possessed authority to speak on a particular matter, the person's use of social media will only be deemed a state action if the official "purported to exercise that authority when speaking in the relevant social-media posts." *Id.* at 204. *Lindke* provided that we are to look for key clues—

- Is the page designated as personal — if so, there would be a strong (but not irrebuttable) presumption of no state action?

- Does the post expressly invoke state authority?

- Simply "liking" or re-tweeting official policy is less likely to be seen as an official act.

- Using "government staff to make a post" will very likely be deemed an official act.

In a "mixed use" account like the kind Freed undertook here, *Lindke* instructs federal courts to examine the "content and function" *of each post* to determine whether the official was purporting to exercise state authority in that individual post. *Id.* at 203 ("Categorizing posts that appear on an ambiguous page like Freed's is *a fact-specific undertaking* in which the post's content and function are the most important considerations."). This post-by-post specific inquiry is designed to ensure that officials retain the ability to speak in a private capacity even on "mixed use" accounts.

However, *Lindke* went one step further. This cases charges Freed with both comment deletion from state actor posts *and* account blocking. **Compl., RE 1, PageID #13-14.** For comment deletion claims, "the only relevant posts are those from which [the plaintiff's] comments were removed." 601 U.S. at 204. But because certain social media blocking functions operate across the entire account, "a court would have to consider whether Freed had engaged in state action with respect to any

post on which Lindke wished to comment." *Id.* The teaching is that a citizen cannot be blocked if there is even one official post within a mixed use account, and thusly confirming the cautionary missive the Court unanimously foreshadowed — officials who commingle personal and official posts without clear designations have "greater potential liability" since the First Amendment implicates both types of speech-related activities.

After the Supreme Court's decision, Plaintiff Lindke moved to remand to the District Court in light of the new standard to undertake the fact-specific inquiry required for mixed accounts. **CA6 Dk No. 39**. This Court responded by requesting additional briefing. **CA6 Dk No. 42.**

# ARGUMENT

Broadly requested, this Court should decline to act at this time and instead remand the matter to the District Court. This Court is a "court of review, not first view." *Taylor v. City of Saginaw, Mich.*, 11 F.4th 483, 489 (6th Cir. 2021) (citing *United States v. Houston*, 792 F.3d 663, 669 (6th Cir. 2015)). The *Lindke* test is new, now requires some additional discovery, see Footnote 7, *supra*, and this Court "may not reach out to decide entirely new claims not presented to a trial court." *United States v. Martin*, 367 Fed. App'x 584, 585 (6th Cir. 2010) (Merritt, J., concurring). The parties and the District Court operated on the assumption that versions of the function-and-appearance test, as utilized by other circuits, was the operative standard. **Opinion, RE 34, PageID #1530.** They also assumed that Freed's account had to be deemed either public or private. Lindke clarified that a "mix use" account is real legal thing. While this Court adopted a first of its kind bright line with that either-or thinking in mind, the Supreme Court in *Lindke* rejected both and adopted a new test never before utilized by any circuit. As such, the customary practice is to allow full briefing and argument on [undecided] issue[s] *at the trial level.*" *Houston*, 792 F.3d at 669 (emphasis added).

This Court has instead asked a series of questions which are being answered by this briefing. However, the overriding argument of Plaintiff Lindke remains the same—the appropriate next step of this Court is to continue to be the error correcting court it is, recognize that its previously adopted test now conflicts with *Lindke*, and remand to the District Court as the court of first instance. In the District Court, the trial court will be asked to review two things. First, were the comments deleted by Freed part of a state actor social media post? See *Lindke*, 601 U.S. at 204 ("the only relevant posts are those from which Lindke's comments were removed."). This is a different approach that the parties and the lower court originally undertook. Second, the trial court would have to consider whether Freed had engaged in state action with respect to posts on which Lindke wished to comment when the act of blocking operated on a page-wide basis. *Id.* Such review is appropriate for the federal trial court.

**RESPONSE TO QUESTIONS**

I.  **Questions 1 and 2**

The Court's first question inquires how the new *Lindke* test differs from this panel's previous self-made test (which was different from the District Court's test)? Simply stated, the measuring stick fully changed.

First, the District Court originally suggested it "relie[d] on" the other circuits' tests based on appearance and function as "useful guides." **Opinion, RE 34, PageID #1530** (citing *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019) and *Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019)). Pulling together the various aspects, the District Court self-created a fourteen-factor[8] test. **Id. at PageID #1531**. This Court later rejected that approach by "adopting a somewhat different analysis" than all other circuits and undertook a totally different analysis than done by the District Court. See

---

[8] The District Court adopted the following fourteen factor standard—(i) how the public official describes and uses the page; (ii) how others, including government officials and agencies, regard and treat the page; (iii) whether the public official is identified on the page with the public position he or she holds (such as through the title of the page or cover or profile photos); (iv) whether the public official uses the page to announce official business; (v) how the page is categorized (as either a "government official" or a "public figure"); (vi) whether the page includes governmental contact information; (vii) whether posts are expressly addressed to constituents; (viii) whether the public official solicits comments or invites constituents to have discussions on the page; (ix) whether the content posted relates to official responsibilities and business conducted in an official capacity; (x) to whom features of the page are made available; (xi) the use of government resources, including government employees, to maintain the page; (xii) whether creating the account is one of the public official's enumerated duties; (xiii) whether the account will become state property when the public official leaves office; and (xiv) whether the public official's social media activity takes place during normal working hours. *Lindke*, 563 F. Supp. 3d at 710-711.

*Garnier v. O'Connor-Ratcliff*, 41 F.4th 1158, 1176 (9th Cir. 2022). It established – for the first time – the bright line "duty-and-authority" test. *Lindke*, 37 F.4th at 1204. Shortly thereafter, the Ninth Circuit "decline[d] to follow" this Court's "reasoning." *Garnier*, 41 F.4th at 1177. But in the end, the Supreme Court rejected all of them and staked out its own in *Lindke*.

So what is different? This Court previously held that "[w]hen analyzing social-media activity, we look to a page or account *as a whole*, not each individual post." *Lindke*, 37 F.4th at 1203. That was in error. This Supreme Court held directly the opposite. *Lindke*, 601 U.S. at 204. Problematically, neither this Court nor the District Court has, to date, undertaken the "fact-specific undertaking in" each "post's content and function." *Id.* at 203. Both only spoke in broad generic standards and left the specific factual questions, thus far, unanswered.

Secondly and related, Lindke also explained that, as far as deletion goes, the only relevant posts are those from which Lindke's comments were removed—not a particular tally or numerical threshold of private versus state actor postings (as previously suggested by Freed). *Id.* at 204.

This Court never previously looked to any of the specific posts when undertaking its analysis.

Third, this Court also suggested, in an all-or-nothing fashion, that an official operates a 'state actor' social-media account when acting either (1) pursuant to his actual or apparent duties or (2) using his state authority. *Lindke*, 37 F.4th at 1204. The Supreme Court explained instead it is sufficient state action when "the official (1) possessed actual *authority* [not *the duty*] to speak on the State's behalf, and (2) purported to exercise that *authority* when he spoke on social media. *Lindke*, 601 U.S. at 191. By framing the issue as one of duty rather than the more broadly based notion of authority, this Court set the measuring stick too high. A duty is a strict *obligation* to act while having the authority is more permissive, and encompasses a wider swatch of acts that can constitute state action. For example, a police officer has *the duty* to secure a warrant before a permissionless search of a home, but that same officer has *the authority* (but not the mandatory obligation) to issue a speeding ticket for a lead-footed driver.

Because *Lindke* establishes a new wider test that allows for a finding of state action based on authority that can be based on *either*

"written law" that "authorized the post" (i.e., statute, ordinance, regulation) or when a government official undertook "persistent practices" (i.e., custom and usages) that effective become "the force of law," this Court's prior test was too restrictive.

This Court secondarily asks how does *Lindke* affect the outcome that this court previously reached, if at all? Given the new test and key factual questions that need new answers, a do-over is required. But on the current remand, the do-over is partial. The unanimous decision from our Nation's highest court supplied key guideposts on how to analyze this case. First, Freed's specific social media account is not a per se public or per se private account—it is a "mixed use" account. Being such, it requires "a fact-specific undertaking in" each "post's content and function" as "the most important considerations." *Id.* at 203. "[I]t is crucial for the plaintiff to show that the official is purporting to exercise state authority [not duty] in specific posts." *Id.*

In the briefing before the trial court, the death-knell decision for the case was Freed's motion for summary judgment. He broadly argued, in conclusory fashion, that his Facebook account "is a privately owned account" and could only come within state action if he, as a government

official, "traditionally and exclusively performed the function." **MSJ, RE 23, PageID #643.** That sounds an awful lot like the test *Lindke* rejected. And there was no mention, discussion, or analysis of the "mix use" status Freed's Facebook account operated as.

Problematically, Freed's counsel also never performed the post-by-post analysis as *Lindke* now requires despite conceding that the frequency of his posts being "city" business or "COVID" related (as opposed to "personal") were between four and 20 times each month from March 2019 to May 2020. **MSJ, RE 23, PageID #638.** So this is not an example of one stray "gotcha" social media post. The regularity of public-related posts, even as previously conceded by Freed, were at least weekly (four times a month) and often far more frequent.

This Court is not the forum properly equipped to handle the first-instant factual undertaking of the post-by-post review of "the relevant posts" where "Lindke's comments were removed." *Id.* at 204. That belongs with the federal trial court as these are effectively new claims that have never before been analyzed. This Court's job is to "correct errors *of law*." *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1118, 1129 (11th Cir. 2005). The District Court's fourteen-part test was in error. Remanding to

the District Court with the new test and instructions on mixed use accounts, supplied by the correction of law from *Lindke*, is the appropriate course for this case.

But even getting past the individual comment deletions, Freed "[b]locking" Lindke encompasses a second "different story," i.e. another theory of the case. *Lindke*, 601 U.S. at 204. "If page-wide blocking is the only option," which has not been addressed directed by the District Court, a public official might be unable to prevent someone from commenting on his personal posts without risking liability for also preventing comments on his official posts. *Id.* And blocking all of Lindke's access is precisely what Freed did, **Lindke Dep., RE 28-11, PageID #1445** (Freed "blocked me and took away my ability to comment on his page"), *despite* the concession that non-personal "city" and COVID posts were frequently and regularly made on Freed's social media account. **MSJ, RE 23, PageID #638.**

Because of these key factual issues as well as a new test being deeper and wider than this Court's or the District Court's holding, the appropriate course is to remand this matter to the trial court with its

expertise in reviewing material disputes regarding the application of a new nation-wide test the Supreme Court has established *Lindke*.

## II.    Question 3

The third question seeks to parse what constitutes actual state action. As noted previously, Congress has created liability under Section 1983 when a person acts under the color of any 1.) statute, 2.) ordinance, 3.) regulation, 4.) custom, or 5.) usage. The first three are encapsulate expressed-made law while the latter two address acts. When depriving a citizen of constitutional rights, Congress has made *all of them* equally wrongful. 42 U.S.C. § 1983. This Court has asked how may a plaintiff establish the latter showing in the social media context when *Lindke* suggests that a post is state action any time the official made it pursuant to his job duties? Either approach works. But the reality is that this Court cannot craft a *one-size-fits-all* bright light as it had tried to do with its duty-and-authority test. Instead, the *Lindke* Court explained that the review process is a "*fact-specific* undertaking" where *each* post's "content and function" are the "most important" considerations. 601 U.S. at 203. The simplest factual circumstances are easy. When *all* posts are involving government business or solely linked to a government, it is

state action. When there is *all* personal post and absolutely no connection to public business or the government, the account is private action. But this case is neither—it is a "mixed use" account. Even Freed conceded a more than de minimis number of his posts involve "City" business mixed in with "Personal"—

| Date | Personal | City | COVID | Total |
|---|---|---|---|---|
| Mar-19 | 25 | 8 | 0 | 33 |
| Apr-19 | 24 | 10 | 0 | 34 |
| May-19 | 29 | 12 | 0 | 41 |
| Jun-19 | 24 | 9 | 0 | 33 |
| Jul-19 | 24 | 7 | 0 | 31 |
| Aug-19 | 21 | 4 | 0 | 25 |
| Sep-19 | 18 | 12 | 0 | 30 |
| Oct-19 | 34 | 6 | 0 | 40 |
| Nov-19 | 24 | 5 | 0 | 29 |
| Dec-19 | 19 | 6 | 0 | 25 |
| Jan-20 | 12 | 8 | 0 | 20 |
| Feb-20 | 16 | 6 | 0 | 22 |
| Mar-20 | 29 | 10 | 20 | 59 |
| Apr-20 | 33 | 5 | 15 | 53 |
| May-20 | 10 | 4 | 2 | 16 |

**MSJ, RE 23, PageID #638.** So this Court has asked what is appropriate standard for this court to apply on remand? As *Lindke* confirmed, Freed's account did not have a renouncing label (e.g., this is the personal page of James R. Freed) or a disclaimer (e.g., the views expressed are strictly my own), so it is not entitled to any "heavy presumption" that all of the posts on his page were personal. And there is no per-se indications of his account being private or personal. So it becomes a factual inquiry "for the plaintiff to show that the official is purporting to exercise state authority

in specific posts" in a mix use account. The standard is whether the challenged post's content and function acts in furtherance of official responsibilities. Yes, "the line between private conduct and state action is difficult to draw," but it is one based on *fact*, not an overly-generalized rule for this Court to attempt to craft for all circumstances.

Examples may help. On March 16, 2020 (during business hours), Freed posted—



**Administrative Directive Post, RE 28-6, PageID #1220**. It is a copy

of a government order (or what is conventionally called an "administrative directive") issued by Freed. This easily meets the standard — its content and function, i.e. communication about the changes being order by Freed regarding way city roads operate in the downtown area because of COVID-19, was a post in furtherance of official responsibilities as "chief administrative officer." See *Lindke*, 601 U.S. at 203 ("Take a mayor who makes the following announcement exclusively on his Facebook page: 'Pursuant to Municipal Ordinance 22.1, I am temporarily suspending enforcement of alternate-side parking rules.' The post's express invocation of state authority, its immediate legal effect, and the fact that the order is not available elsewhere make clear that the mayor is purporting to discharge an official duty."). Conclusion: state action. (But discovery is needed to discover if this administrative directive was publicly "available elsewhere" or not, which might be relevant.)

Another example—



**Administrative Directive Posting, RE 28-6, PageID #1222**. Again, clearly "discharg[ing] an official duty." *Lindke*, 601 U.S. at 203. *Lindke* confirms that such a post is state action.

But what about this one—



All I wanted for my birthday today was to take a walk with these two.

Mar 9, 2020, 2:15 PM

**"These Two" Posting, RE 28-6, PageID #1224.** Clearly a picture of a daughter and her dog on Freed's birthday largely does little in furtherance of any official government responsibilities (although it might advance his political goals and/or community standing, see, e.g., **Shirkey Tweet, RE 28-18, PageID #1476** (https://t.co/rxslEoKY1b, Michigan's then Senate Majority Leader's grandson winning) and **Whitmer Tweet, RE 28-19, PageID #1477** (https://t.co/pUpsYe0UFq, Governor's family

dogs)). Such could arguably not be state action (unless done for retail politics to the general public).[9]

But those are easy ones. What about bringing together one's personal or professional life into one's governmental media messaging? Such is normal of public officials for political reasons. Freed is no different. This is apparent because, for nearly every picture in a professional setting, Freed is *in* the photograph, not *taking*[10] it—

 

Great press conference today with Mayor Repp announcing the completion of our "Reduce and Restructure Strategy" for unfunded liabilities. This plan is projected to save the taxpayers $87million...Working together, we have ensured that the next generation won't bare the burden of our unfinished business and hardworking public workers are protected. Michigan, a roadmap has been built. Follow it.

Mar 4, 2020, 4:51 PM

---

[9] Interestingly enough, no one posted any criticism of Freed, his boss (the Mayor and City Council), or their government on any family-type posts.

[10] That would mean that someone, likely a staffer or city employee, is the one taking such photographs.

**Press Conference, RE 28-6, PageID #1229**. And that happens outside

city hall too—



The crew at the State of the State Address.

Jan 29, 2020, 7:54 PM

**State of the State Post, RE 28-6, PageID #1243**. Here, Freed and "the

crew" are broadcasting that they are participating in the annual "State

of the State" address given by the Michigan governor to a joint session of

the Michigan Legislature.[11] Does this post's content and function act in

furtherance of Freed's official responsibilities? The answer is seemingly

yes. Publicly flouting one's connections and access for *political* advantage

---

[11] https://www.michigan.gov/whitmer/news/state-of-the-state/2020

through official governmental communications platforms is nothing new. E.g. See Hannah Morrill, *The Kennedy Family Through the Decades*, Town & Country, Oct. 8, 2020 *available at* https://bit.ly/3ozy0WG.

But all of this means that *context* matter—



Been a few years, but we got her lit back up! We need another one by the bridge. Working on that now.

Mar 4, 2020, 7:10 PM

**Port Huron Sign Posting, RE 28-6, PageID #1229**. This sign is a well-known landmark in the City of Port Huron that "we" got lit back up. The message is clear—Freed is calling for another sign in Port Huron. And Freed tells everyone he is "[w]orking on that now." A bright line test simply does not work here. The post needs to be addressed within *its context*. If Freed is, hypothetically, working as a volunteer on the citizen's fundraising committee outside work hours, this could be deemed a

private post. If he is suggesting he is working on that *as the city manager* using the public's tax dollars, the message fits more readily as state action. To judge whether this on-the-line post is state action or otherwise will take a "fact-specific undertaking in which the post's content and function." Questions will need to be asked. Objective evidence will need to be gathered and presented. And perhaps if all the other posts were of dogs and daughters, courts could lean towards finding such private. But a simple review of the all the posts shows a longstanding practice of such community-minded posts being government-related for which Freed is its head or chief executive. Resolving disputes on 'context' questions are within the institutional purview and expertise of juries as a question of fact, not intermediate federal appellate courts as a question of law.

## III.    Question 4

Next, the Court asked which of Freed's posts, if any, purport to exercise government authority and which posts, if any, were made pursuant to his official job duties? This question is a red-herring because the Supreme Court has already declared (or effectively declared) Freed's Facebook account to be one of "mixed use." The question of what constitutes the threshold to become a mix use account does not be to be

answered or reexamined for this case. Instead, what remaining, is questioning the specific post(s) where Lindke's comments were deleted. 601 U.S. at 204 ("the only relevant posts are those from which [the plaintiff's] comments were removed."). Further record development is needed, including access to the posts themselves.[12]

## IV. Question 5

The Court correctly recites that Lindke has moved to remand this case to the District Court. The reason is because, as repeatedly recounted throughout, the inquiry is on a post-by-post basis and "[c]ategorizing posts that appear on an ambiguous [mix use] page like Freed's is a *fact-specific* undertaking" where each post's content and function are the most important considerations to determine whether its author is undertaking state or private action. And because there is easily several state actor posts, cutting off all access as Freed did to Lindke (i.e. blocking fully)

---

[12] Freed testified that he "unpublished," but did not delete, his Facebook account after this lawsuit started. **Freed Dep., RE 23-2, PageID # 687-688**. Plaintiff Lindke previously suggested the courts "should strongly consider ordering Mr. Freed to reactivate the City Manager's Facebook Page for [its] own review." **Appellant Reply Br. (CA6 Dk #18) at 2 fn.1**. Given that specific posts themselves are now critical under *Lindke*, such should absolutely be ordered (or the same be retrieved from Facebook's servers via a federal subpoena).

unquestionably violated the First Amendment. But resolution of factual disputes between Plaintiff and Defendant on individual posts rests with the *Lindke* jury, not this Court.

This Court's post-remand order ponders whether the Supreme Court's test is narrower than this panel's previous one. It is not. The *Lindke* test is wider and more inclusive of what constitutes state action than this Court's duty-and-authority test. But remember, this Court need not decide what is *the nature* of Freed's Facebook account—the Supreme Court already did that for us. It is a "mixed use" account. What the lower courts must decide, post-*Lindke*, is whether the comments deleted by Freed constitute state action because the criticism offered was deleted under a state actor's post. For comment deletion issues, "the only relevant posts are those from which [the plaintiff's] comments were removed." For Kevin Lindke, that was the "Mayor Repp" posts. **Lindke Dep., RE 28-11, PageID #1452** ("I think I made a total of maybe four to six comments about various things, various posts that Mr. Freed had made and various posts that Mayor Repp had made and just their response to the pandemic. I commented on it. And, yeah, it didn't take very many before he deleted those comments and blocked me and took away my ability to comment on

his page."). But neither side has developed that argument well or fully because the focus, until now, has been the *function* and *appearance* of Freed's *overall* Facebook account, not the specific posts. See **Motion, RE 13, PageID # 107** ("This case is modelled on the same issues raised between Twitter users and President Donald Trump in *Knight First…*" which used a function and appearance review). The concept of a mixed use social media account never existed before and discovery is needed to parse out more about the deleted comments in the context of the specific post to determine whether state action is implicated. So while this Court could be poised to find a First Amendment violation by Freed for blocking Lindke, the record is too unclear to decide whether it violated the Constitution when Freed deleted particular comments from specific posts. A remand with further record development is needed.

## RELIEF REQUESTED

WHEREFORE, the Court is vacated the final judgment entered by the lower court; reverse the grant of summary judgment for Defendant-Appellee James Freed; and remand the matter for further proceedings.

Date: June 13, 2024

s/ Philip L. Ellison
PHILIP L. ELLISON
OUTSIDE LEGAL COUNSEL PLC
530 West Saginaw St
PO Box 107
Hemlock, MI 48626
(989) 642-0055
pellison@olcplc.com

*Attorney for Appellant*
*Kevin Lindke*

# CERTIFICATE OF COMPLIANCE

Pursuant to Sixth Circuit Rule 32(a)(7)(C) and Sixth Circuit Rule 32(a), the undersigned certifies that this brief complies with the type-volume limitations of the Sixth Circuit Rule 32(a)(7)(B).

This brief has been prepared in proportional typeface using Century School Book 14-point font. The brief, including headers and footnotes, contains is less than forty (40) pages as ordered by this Court.

The undersigned understands that a material misrepresentation in completing this certificate or circumvention of the type-volume limitations may result in the Court's striking the brief and imposing sanctions against the person signing the brief.

Date: June 13, 2024

s/ Philip L. Ellison
PHILIP L. ELLISON
OUTSIDE LEGAL COUNSEL PLC
530 West Saginaw St
PO Box 107
Hemlock, MI 48626
(989) 642-0055
pellison@olcplc.com

*Attorney for Appellant*
*Kevin Lindke*

## CERTIFICATE OF SERVICE

I hereby certify that on the date stated below, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send notice of and a copy of such filing to counsel of record at their email address(es) of record.

Date: June 13, 2024

s/ Philip L. Ellison
PHILIP L. ELLISON
OUTSIDE LEGAL COUNSEL PLC
530 West Saginaw St
PO Box 107
Hemlock, MI 48626
(989) 642-0055
pellison@olcplc.com

*Attorney for Appellant*
*Kevin Lindke*

# DESIGNATION OF RELEVANT
# DISTRICT COURT DOCUMENTS

| RE. | PageID Range | Description of the Document |
|---|---|---|
| 1 | #1-16 | Complaint |
| 1-1 | #17 | About [Page] |
| 1-2 | #18-15 | Administrative Directive Facebook Post |
| 13 | #103-116 | Motion for Protective Order |
| 23 | #623-659 | Defendant's Motion for Summary Judgment |
| 23-2 | #662-697 | James Freed's Deposition Transcript |
| 28-2 | #1152-1153 | What's the Difference |
| 28-3 | #1154 | March 26, 2020 Post |
| 28-4 | #1155 | JamesRFreed1 Page Profile Information |
| 28-5 | #1156 | Page Setting |
| 28-6 | #1157-1411 | Facebook Posts |
| 28-7 | #1412-1416 | DeWitt Deposition Transcript |
| 28-8 | #1417-1421 | St. John Deposition Transcript |
| 28-9 | #1422-1427 | Woodley Deposition Transcript |
| 28-10 | #1428-1438 | Pecar Deposition Transcript |
| 28-11 | #1439-1457 | Lindke Deposition Transcript |
| 28-14 | #1466-1468 | City Manager Webpage |
| 28-17 | #1475 | Biden Tweet |
| 28-18 | #1476 | Shirkey Tweet |
| 28-19 | #1477 | Whitmer Tweet |
| 28-20 | #1478-1479 | Your Home Page |
| 28-21 | #1480 | How Do I Comment |
| 28-22 | #1481 | How Do I Hide or Delete |
| 28-23 | #1482-1483 | How Do I Ban or Unban Someone |
| 34 | #1523-1538 | Opinion |