No. 21-2977

# IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

Kevin Lindke,

*Plaintiff–Appellant,*

v.

James R. Freed, in his official and personal capacities,

*Defendant–Appellee.*

On appeal from the United States District Court for the
Eastern District of Michigan — No. 2:20-CV-10872 (Goldsmith, M.)

On remand from the Supreme Court of the United States

## BRIEF OF AMICI CURIAE THE KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY AND ELECTRONIC FRONTIER FOUNDATION IN SUPPORT OF APPELLANT

David Greene
Sophia Cope
Electronic Frontier Foundation
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
davidg@eff.org

Stephanie Krent
Alexia Ramirez
Katie Fallow
Knight First Amendment Institute at
    Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
stephanie.krent@knightcolumbia.org

# Table of Contents

Corporate Disclosure Statement ................................................................... ii

Table of Authorities .................................................................................... iv

Interest of Amici Curiae ..............................................................................1

Introduction .................................................................................................3

Argument .....................................................................................................6

I.     State action is present in social media blocking cases when public officials rely on their general authority to speak on behalf of the government. .........................................................................................6

     A.    Officials typically have authority to speak on behalf of the government when they are high-ranking or when they have responsibility over the subject matters being discussed. ............... 6

     B.    Officials exercise their authority to speak on behalf of the government when they write social media posts or operate their accounts in furtherance of their job duties ........................... 11

II.    In applying the Supreme Court's state action test, this Court should be mindful of the important role of social media in facilitating public discourse and democratic accountability. .....................................19

III.   Given the differences between the Supreme Court's approach and this Court's previous opinion, this case should be remanded for further discovery and analysis by the district court. ...............................21

Conclusion .................................................................................................25

Certificate of Compliance ..........................................................................26

Certificate of Service .................................................................................27

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 21-2977          Case Name: Lindke v. Freed

Name of counsel: Stephanie Krent

Pursuant to 6th Cir. R. 26.1, Knight First Amendment Institute at Columbia University
*Name of Party*

makes the following disclosure:

1.   Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No.

2.   Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> None.

CERTIFICATE OF SERVICE

I certify that on _____ June 20, 2024 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/Stephanie Krent

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 21-2977                    Case Name: Lindke v. Freed

Name of counsel: Stephanie Krent

Pursuant to 6th Cir. R. 26.1, Electronic Frontier Foundation
                              *Name of Party*

makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

None.

### CERTIFICATE OF SERVICE

I certify that on _____ June 20, 2024 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/Stephanie Krent

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# Table of Authorities

## Cases

*Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019) ........................................ 3, 17, 18

*Faison v. Jones*, 440 F. Supp. 3d 1123 (E.D. Cal. 2020) ........................................ 9

*Fasking v. Merrill*, No. 2:18-cv-809-JTA, 2023 WL 149048 (M.D. Ala. Jan. 10, 2023) ................................................................................................ 9

*Grace Bible Fellowship, Inc. v. Me. Sch. Admin. Dist. No. 5*, 941 F.2d 45 (1st Cir. 1991) ............................................................................................ 18

*Hopper v. City of Pasco*, 241 F.3d 1067 (9th Cir. 2001) ........................................ 18

*Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019) ................................................................................... passim

*Lane v. Franks*, 573 U.S. 228 (2014) ........................................................... 10

*Lindke v. Freed*, 37 F.4th 1199 (6th Cir. 2022) ........................................... 22, 23

*Lindke v. Freed*, 601 U.S. 187 (2024) ............................................................ passim

*Marchese v. Lucas*, 758 F.2d 181 (6th Cir. 1985) ............................................ 8

*McVey v. Stacy*, 157 F.3d 271 (4th Cir. 1998) ................................................ 11

*Mills v. City of Barbourville*, 389 F.3d 568 (6th Cir. 2004) ................................ 7

*Packingham v. North Carolina*, 582 U.S. 98 (2017) ........................................ 19

*Simasko v. Cnty. of St. Clair*, 417 F.3d 559 (6th Cir. 2005) ............................... 11

*Stewart v. D.C. Armory Bd.*, 863 F.2d 1013 (D.C. Cir. 1988) .............................. 18

*West v. Shea*, 500 F. Supp. 3d 1079 (C.D. Cal. 2020) ........................................ 9

*Wright v. City of Euclid*, 962 F.3d 852 (6th Cir. 2020) ....................................... 8

## Other Authorities

Alexandria Ocasio-Cortez (@AOC), X (May 19, 2023, 4:07 PM),
      https://perma.cc/8ZA4-8FAN...................................................................... 15

Br. for Elec. Frontier Found., *Lindke v. Freed*, 601 U.S. 187 (2024)
      (No. 22-611) ...................................................................................... 20

Chief Art Acevedo (@ArtAcevedo), X (Sept. 15, 2018, 8:04 PM),
      https://perma.cc/PV54-53XW ................................................................ 15

*City Manager*, City of Port Huron, https://perma.cc/S339-NT3T.......................... 23

G.T. Bynum (@GTBynum), X (Feb. 27, 2024, 7:19 AM),
      https://perma.cc/E3AR-L8Q9.................................................................. 13

Kamala Harris (@KamalaHarris), X (May 16, 2024, 11:48 AM),
      https://perma.cc/H848-K4TM ................................................................ 14

Katie Hobbs (@katiehobbs), X (May 3, 2024, 4:06 PM),
      https://perma.cc/WX87-TEGZ ............................................................... 14

Lauren Boebert (@LaurenBoebert), X (Mar. 18, 2024, 4:30 PM),
      https://perma.cc/3NRF-M395.................................................................. 14

Michael Gold, *Ocasio-Cortez Apologizes for Blocking Critic on
      Twitter*, N.Y. Times, Nov. 4, 2019, https://perma.cc/R5RX-HPKL ................. 20

Mike Johnson (@MikeJohnson), X (Feb. 24, 2024, 9:37 PM),
      https://perma.cc/F4KF-RZGN.................................................................. 14

Nahal Toosi, *Nikki Haley's Twitter Account Raises Protocol
      Concerns*, Politico (May 20, 2018, 8:23 AM),
      https://perma.cc/3NKH-L8L8 ............................................................ 16, 20

Patrick Van Kessel et al., *Congress Soars to New Heights on Social
      Media*, Pew Res. Ctr. (July 16, 2020), https://perma.cc/38AJ-4F9G.......... 19, 20

Sarah Huckabee Sanders (@SarahHuckabee), X (Apr. 11, 2023, 9:41
      PM), https://perma.cc/NKF5-EMJY .................................................... 13

Ted Lieu (@TedLieu), X, https://x.com/tedlieu (last visited June 20, 2024) ................................................................................................ 15

*U.S. Digital Registry*, U.S. Gen. Servs. Admin., https://perma.cc/A5E8-B67N .............................................................. 19

## Interest of Amici Curiae[1]

The Knight First Amendment Institute at Columbia University is a non-partisan, not-for-profit organization that works to defend the freedoms of speech and the press in the digital age through strategic litigation, research, and public education. The Institute's aim is to promote a system of free expression that is open and inclusive, that broadens and elevates public discourse, and that fosters creativity, accountability, and effective self-government. The Institute is particularly committed to protecting the integrity and vitality of online forums in which citizens communicate with each other and government representatives about matters of public concern, and it has represented plaintiffs in social media blocking cases involving government actors and entities. *See Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019); *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019), *vacated as moot sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (mem.) (2021); *People for the Ethical Treatment of Animals v. Tabak*, No. 23-5110 (D.C. Cir. 2023).

---

[1] Amici submit this brief pursuant to this Court's April 30, 2024 Order inviting amici to file briefs in response to the questions posed by the Court's Order. *See* Dkt. 42. No counsel for a party authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than amici curiae, its members, or its counsel contributed money that was intended to fund preparing or submitting the brief.

Recognizing the internet's power as a tool of democratization, the Electronic Frontier Foundation (EFF) has, for over 30 years, worked on behalf of its more than 30,000 dues-paying members to protect the rights of users to transmit and receive information online. EFF has written extensively on the issues presented in this appeal and has filed amicus briefs in similar cases, including in the Supreme Court's consideration of this case, *Lindke v. Freed*, 601 U.S. 187 (2024), as well as circuit cases including *Knight First Amendment Institute at Columbia University v. Trump*, 928 F.3d 226 (2d Cir. 2019), *Robinson v. Hunt County*, 921 F.3d 440 (5th Cir. 2019), and *Campbell v. Reisch*, 986 F.3d 822 (8th Cir. 2021), and has represented plaintiffs in social media blocking cases involving government accounts, including *People for the Ethical Treatment of Animals, Inc. v. Young*, No. 4:18-cv-01547 (S.D. Tex. 2018), and *People for the Ethical Treatment of Animals, Inc. v. Young*, No. 4:20-cv-02913 (S.D. Tex. 2020).

## Introduction

The Supreme Court's decision in this case, *Lindke v. Freed*, recognizes that public officials are bound by the First Amendment when they operate social media accounts in their official capacities. Its decision confirms what a growing chorus of courts have held over the last several years: government-operated social media accounts that allow members of the public to post comments in the accounts' comment threads are digital-age public squares, and they must remain free from government censorship. *See, e.g.*, *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019), *vacated as moot sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (mem.) (2021); *Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019).

Amici are free speech organizations committed to protecting and strengthening public discourse in the digital age and submit this brief to assist this Court in interpreting and applying the state action test in light of the Supreme Court's opinion in this case.

The Supreme Court held that a public official's use of social media constitutes state action—and is therefore subject to First Amendment scrutiny—if the official "(1) possessed actual authority to speak on the State's behalf, and (2) purported to exercise that authority when he spoke on social media." *Lindke v. Freed*, 601 U.S. 187, 191 (2024) . Careful application of this test will play a crucial role in ensuring

that digital public forums live up to their promise as sites of open public communication and political engagement. This brief makes three points about the application of the Supreme Court's decision.

First, in addressing the "authority" prong of the state action test, the central question is whether, through law or custom, the public official has authority to speak on behalf of the government. The test does not require authorization to speak on social media specifically; it is enough that the official is authorized to speak on behalf of the government generally. In cases involving high-ranking officials, like elected representatives and agency heads who have broad authority and public-facing roles, this question will usually be easily answered in the affirmative. For lower-ranking officials, the authority inquiry may require a closer look at the subject of the official's speech, her job responsibilities, and the practices of the official and her predecessors.

Second, in addressing the "exercise" prong of the state action test, courts should consider the nature of the official's account, the nature of the posts relevant to the plaintiff's claim, and, where appropriate, additional features of the official's account. In general, when an official who has authority to speak on the government's behalf posts on a government-owned account, uses government resources to operate her account, or holds herself out as a public representative through her social media account, she is using that account as a tool of governance and her conduct is

attributable to the state. This is so even if the account predates her time in office or is nominally personal—for example, if she posts on an account named @JaneDoe instead of @MayorDoe.

Third, in light of the vital importance of government-operated social media accounts to public discourse and political accountability, courts should apply the state action test in a manner that prevents the evasion of constitutional responsibilities. Over the past two decades, government actors—including elected representatives, appointed officials, government agencies, and public institutions—have broadly adopted social media accounts to engage with members of the public and to create space for members of the public to communicate with one another. The vibrancy and integrity of these spaces are threatened when government actors censor disfavored views. To protect these important spaces for public discourse, courts must not allow public officials to dodge constitutional requirements by blurring the lines between private and official speech. Instead, courts should resolve close cases in favor of the public's free speech interests, mindful of the Supreme Court's admonition that officials who invite ambiguity by mixing personal and official speech "expose[]" themselves "to greater potential liability." *Lindke*, 601 U.S. at 204.

Because the Supreme Court gave state action a broader scope than this Court did, and because the parties have not presented evidence sufficient to allow the Court

to take the "close look" required by the Supreme Court's test, *see id.* at 197, this case should be remanded for further fact-finding on the specific issues discussed below.

**Argument**

**I.      State action is present in social media blocking cases when public officials rely on their general authority to speak on behalf of the government.**

In its decision in this case, the Supreme Court confirmed that when government officials speak in their official capacities online, their speech is "attributable to the state" and they are bound by the First Amendment. *Lindke*, 601 U.S. at 191, 197. To separate protected private speech from state action, courts must take a "close look" at both the speech and the speaker, *id.* at 197, to answer two questions: Did the official have authority to speak on behalf of the government? And if so, was she actually exercising that authority when speaking on social media? *Id.* at 198. Answering these questions requires courts to focus on "substance, not labels." *Id.* at 197.

**A.      Officials typically have authority to speak on behalf of the government when they are high-ranking or when they have responsibility over the subject matters being discussed.**

Because officials cannot "conjure the power of the State through [their] own efforts," *Lindke*, 601 U.S. at 199, the first step of the state action analysis is meant to determine whether they have authority to speak officially. Three guideposts for

6

courts addressing the "authority" prong of the state action test are evident from the Supreme Court's opinion.

First, an official's authority can be established through written laws, regulations, or ordinances—explicitly, by expressly authorizing an official to speak on behalf of the government, or implicitly, by conferring on the official a general power to set policy or make decisions that necessarily encompasses the authority to speak on the government's behalf. *Id*. at 200–01. As the Supreme Court explained, "state law might grant a high-ranking official like the director of the state department of transportation broad responsibility for the state highway system that, in context, includes authority to make official announcements on that subject." *Id.*

Second, the authority to speak on the government's behalf may be established by "custom and usage," which "encompass 'persistent practices of state officials' that are 'so permanent and well settled' that they carry 'the force of law.'" *Id*. at 200 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)). Importantly, a "custom" may exist even if it is not age-old. Thus, in the context of municipal liability, this Court has explained that a custom need only be settled enough to distinguish official conduct from "the random, unauthorized acts" of municipal employees. *See Mills v. City of Barbourville*, 389 F.3d 568, 578 (6th Cir. 2004). Evidence of the official's current practices may in some circumstances be sufficient to establish the custom. For example, this Court concluded that a jury could

reasonably find the existence of "a custom of allowing excessive force" based on evidence of the city's current training materials, without considering the length of time the training materials had been used. *Wright v. City of Euclid*, 962 F.3d 852, 880–81 (6th Cir. 2020); *see also Marchese v. Lucas*, 758 F.2d 181, 187–89 (6th Cir. 1985) (finding a custom of "official toleration" of excessive force when sheriff declined to seriously investigate the beating of the plaintiff when he was a prisoner). In light of this Court's precedent, it would be reasonable for courts analyzing custom in this context to consider employment-related documents, like employment contracts and job descriptions; evidence about the way an official executes her job duties; and even evidence about her predecessors' practices.

Third, the authority that matters at this step of the inquiry is the authority to speak on behalf of the government generally, not the authority to post on social media in particular. If an official has the general power to speak on behalf of the government, it is not necessary for the court to determine that the official has authority to speak via any specific medium. *See Lindke*, 601 U.S. at 200. A more stringent definition of authority, linked to the particular medium of communication, would contravene the Supreme Court's guidance and would risk making the First Amendment a dead letter in this context, because it would be difficult for courts to identify a "custom and usage" of that technology that was sufficiently "persistent," "permanent," and "well-settled." Courts should avoid an interpretation of authority

that would give officials free rein to violate the First Amendment rights of constituents when they adopt a new medium for communication.

Given these guideposts, courts will usually have little trouble concluding that high-ranking officials possess the requisite authority. Many elected officials, like presidents, governors, mayors, and legislators, have broad authority to speak on government policies and activities. *See, e.g.*, *Knight First Amend. Inst.*, 928 F.3d at 236 (describing a president's use of Twitter "to announce matters related to official government business, including high-level White House and cabinet-level staff changes as well as changes to major national policies" (cleaned up)); *West v. Shea*, 500 F. Supp. 3d 1079, 1086 (C.D. Cal. 2020) (describing mayor's use of social media to "describe[] actions she took as mayor, including ordinances she co-authored, ceremonies she officiated, and meetings she attended").

Heads of government agencies or entities are also generally empowered to speak on matters broadly relevant to those agencies. *Lindke*, 601 U.S. at 199–201; *see also Faison v. Jones*, 440 F. Supp. 3d 1123, 1134 (E.D. Cal. 2020) (noting that a sheriff's "central function" was to "represent the interests of the Sheriff's Department," and many of the sheriff's social media posts advocated on behalf of and spoke about the sheriff's department); *Fasking v. Merrill*, No. 2:18-cv-809-JTA, 2023 WL 149048, at *21 (M.D. Ala. Jan. 10, 2023) (explaining that the Alabama Secretary of State's duties included providing "guidance for election activities," and

noting that the secretary frequently posted on those topics without determining whether posts were attributable to state), *vacated as moot sub nom. Fasking v. Allen*, 2023 WL 2655863 (M.D. Ala. Mar. 27, 2023).

For lower-ranking officials, courts should give "careful attention" to the role the official plays, her area of expertise, and the speech in question. *See Lindke*, 601 U.S. at 200–01. There is less likely to be a relevant law or ordinance that defines the scope of authority for a local superintendent or an assistant director in a government agency, for example. A court's inquiry, then, will likely focus on custom. As discussed above, evidence of the official's own practices, and possibly the practices of her predecessors, *see id.* at 200, will be key in establishing the extent of her authority. For these officials in particular, it will matter whether the speech in question relates to subjects within their "bailiwick[s]." *Id.* at 199; *cf. Lane v. Franks*, 573 U.S. 228, 238 (2014) (considering whether speech was made within "the scope of [an official's] ordinary job responsibilities").

That the "authority" inquiry is relatively straightforward for high-ranking officials and requires a more extensive factual analysis for lower-ranking government employees, makes sense. There are instances in which an official's duties are significant enough that their private rights must yield to their official responsibilities because of their broad governing authority and their public visibility. In the context of a public employee's personal-capacity speech, for example, the

government may have a stronger interest in regulating private speech when the speaker is in certain high-level "policymaking" or "public contact" roles. *See McVey v. Stacy*, 157 F.3d 271, 278 (4th Cir. 1998). And while the First Amendment generally prohibits public employers from firing employees on the basis of their political affiliation, the Supreme Court has recognized that this prohibition does not apply to "public employees in 'policymaking or confidential positions'" where political affiliation is "an appropriate requirement for the effective performance of the public office involved." *Simasko v. Cnty. of St. Clair*, 417 F.3d 559, 562–63 (6th Cir. 2005) (quoting *Branti v. Finkel*, 445 U.S. 507, 518 (1980)).

Of course, the fact that high-ranking officials generally have the authority to speak on behalf of the government does not mean that they *always* speak for the government, or that their own First Amendment rights must be sacrificed in favor of the public's. The second step of the state action inquiry ensures that officials must actually exercise their authority by using social media as a tool of governance before they can be held liable for violations of the First Amendment.

**B.      Officials exercise their authority to speak on behalf of the government when they write social media posts or operate their accounts in furtherance of their job duties.**

The "exercise" prong of the state action test requires courts to consider the nature of the official's account, the nature of the posts relevant to the plaintiff's claim, and the official's operation of the account. In some cases, the presence of state

action may be obvious, but where a social media account is "ambiguous," courts must engage in a "fact-specific undertaking" to determine whether the official was speaking in furtherance of her job duties. *Lindke*, 601 U.S. at 203.

>    **1.    An official exercises her authority when she posts on a social media account owned by her government office.**

At the outset, the nature of an official's account may provide sufficient context to determine whether her speech was made in furtherance of her job duties. Where, for example, the account is owned or created by the office and not the official herself, it is "clear" that the "account purports to speak for the government." *Lindke*, 601 U.S. at 202. An official's actions with respect to these accounts will always be attributable to the state, and the interactive spaces associated with these accounts will be some kind of First Amendment forum. These unassailably official accounts are analogous to official press conferences, which reflect state action even if the government employee shows photographs of their children or shares recipes or their favorite music.

>    **2.    When an official uses a nominally personal account, the content of her relevant social media posts may clarify whether she was exercising her authority in posting on the account.**

The Supreme Court has made clear that when an account is owned by the official herself—that is, when it is "nominally personal"—courts must engage more deeply with the official's posts. When a plaintiff complains about being banned or

blocked altogether from an official's account, the relevant posts for the court's consideration will include all posts the plaintiff would have wished to see or comment on; when a plaintiff complains about a particular comment being deleted or hidden, the relevant posts are those from which the plaintiff's comment was suppressed. *Lindke*, 601 U.S. at 203–04.

The text of the relevant posts alone may be sufficient to demonstrate state action. For example, when then-President Trump used his nominally personal account on Twitter (now "X") to announce, for the first time, that he had fired one chief of staff and hired a new one, he was speaking in furtherance of his official duties as president. *See Knight First Amend. Inst.*, 928 F.3d at 232. And many officials use their social media accounts to make announcements about the government's emergency preparedness or response to local emergencies.[2] That they use their accounts in this way is "significant evidence" they speak as officials responsible for the safety of local residents, not merely as concerned neighbors. *See Lindke*, 601 U.S. at 202.

The inverse is also true: there are some situations where the relevant posts on nominally personal accounts are plainly insufficient to demonstrate the presence of

---

[2] *See, e.g.*, Sarah Huckabee Sanders (@SarahHuckabee), X (Apr. 11, 2023, 9:41 PM), https://perma.cc/NKF5-EMJY; G.T. Bynum (@GTBynum), X (Feb. 27, 2024, 7:19 AM), https://perma.cc/E3AR-L8Q9.

state action. Speaker of the U.S. House of Representatives Mike Johnson, for example, has tweeted about his son's musical performances on his nominally personal account.[3] Vice President Kamala Harris has used her nominally personal account to post anecdotes about her high school graduation ceremony.[4]

Officials also do not represent the government when they author obviously campaign-related posts. *See Lindke*, 601 U.S. at 203 (discussing promoting reelection as private speech). For example, when Arizona Governor Katie Hobbs posted from her nominally personal account to remind Arizonans that "[c]ome November," they "will have the opportunity to defeat anti-choice Republican legislators," she was speaking as a partisan politician, not as the governor of a swing state.[5] So too for U.S. Representative Lauren Boebert, who authored a post on her nominally personal account telling her followers that she needed help "getting this ad in front of every voter in Colorado's Fourth District."[6]

---

[3]    Mike Johnson (@MikeJohnson), X (Feb. 24, 2024, 9:37 PM), https://perma.cc/F4KF-RZGN.

[4]    Kamala Harris (@KamalaHarris), X (May 16, 2024, 11:48 AM), https://perma.cc/H848-K4TM.

[5]    Katie Hobbs (@katiehobbs), X (May 3, 2024, 4:06 PM), https://perma.cc/WX87-TEGZ.

[6]    Lauren Boebert (@LaurenBoebert), X (Mar. 18, 2024, 4:30 PM), https://perma.cc/3NRF-M395.

3. **When the relevant posts on a nominally personal account are consistent with either private or official speech, courts should turn to additional factors about the operation of the social media account.**

In many cases, an official's social media posts will not on their own be sufficient to show whether the official is speaking in a personal capacity or an official one. Public officials routinely post about their jobs in ways that are consistent with both official and campaign-related speech. Public officials often use social media to debate policy issues with one another or with constituents. It is not always apparent whether they are speaking on behalf of their offices or are using their accounts as tools to highlight campaign issues or personal political passions.[7] And public officials sometimes repost official government statements on their nominally personal accounts. For example, U.S. Representative Ted Lieu regularly uses a nominally personal account, @TedLieu, to share posts originally posted on his @RepTedLieu account.[8] As the Supreme Court explained, reposting like this could signal that a re-shared post on an otherwise personal account is private speech, just as a school board president's policy announcement "at a school board meeting" is

---

[7] *See, e.g.*, Alexandria Ocasio-Cortez (@AOC), X (May 19, 2023, 4:07 PM), https://perma.cc/8ZA4-8FAN; Chief Art Acevedo (@ArtAcevedo), X (Sept. 15, 2018, 8:04 PM), https://perma.cc/PV54-53XW.

[8] *See, e.g.*, Ted Lieu (@TedLieu), X, https://x.com/tedlieu (last visited June 20, 2024) (reposting his account @RepTedLieu four times in May and June 2024).

official, but sharing the same information the next day "at a backyard barbecue with friends" is likely private. *Lindke*, 601 U.S. at 201. But the fact that an official is reposting another account does not necessarily mean that the official is speaking in a personal capacity. When an official uses one account to repost messages from another, this may signal that the official has opted to use multiple accounts to conduct government business. As discussed further below, many officials, like former President Trump and former Secretary of State John Kerry, continued using their nominally personal accounts for official purposes when they were in office in order to capitalize on the popularity and goodwill they had already built up on their preexisting accounts.[9]

When the relevant posts are not easy to classify definitively, courts must consider "additional factors" about the nominally personal account, including its appearance, the resources used to operate the account, and the existence of any clear disclaimers. *Lindke*, 601 U.S. at 198, 203.

Whether an official is using social media in furtherance of her job duties, or merely as an outlet for personal or campaign speech, can sometimes be determined

---

[9] *See Knight First Amend. Inst.*, 928 F.3d at 235; *see also* Nahal Toosi, *Nikki Haley's Twitter Account Raises Protocol Concerns*, Politico (May 20, 2018, 8:23 AM), https://perma.cc/3NKH-L8L8 (describing John Kerry's decision to tweet from his nominally personal account because his "pre-existing following was seen as an asset to the State Department").

from the account's appearance. In *Davison v. Randall*, for example, the Fourth Circuit concluded that the chair of the Loudoun County Board of Supervisors "clothed" her Facebook page "in the power and prestige of her state office" because the chair categorized the page as belonging to "a government official," included her official title as the title of the page, and listed her official email address, phone number, and website in lieu of personal contact information. 912 F.3d at 680–81 (cleaned up). And in *Knight First Amendment Institute at Columbia University*, the Second Circuit found it relevant that President Trump's Twitter account was registered to "Donald J. Trump 45th President of the United States of America" and that the main photographs on the account showed the president engaged in official duties. 928 F.3d at 231 (cleaned up). These visual clues helped demonstrate that the officials in question had held themselves out as speaking in their capacities as public representatives.

Whether an official is using social media in furtherance of her job duties can also sometimes be determined by her reliance on government resources. If the account is run in part by the official's staff, maintained using government resources, or regularly updated during working hours, it follows that posting on the account is part of the official's job duties, not a purely personal pursuit. *See Lindke*, 601 U.S. at 203 ("[A]n official who uses government staff to make a post will be hard pressed

to deny that he was conducting government business."); *Knight First Amend. Inst.*, 928 F.3d at 235; *Davison*, 912 F.3d at 673.

Finally, whether an official is using social media in furtherance of her job duties may be informed by her decision to use a personal-capacity disclaimer, though this is not dispositive. *See Lindke*, 601 U.S. at 202. Disclaimers "give speech the benefit of clear context" and therefore create a "heavy . . . presumption" pointing toward private speech. *Id.* But the use of a disclaimer on its own "cannot insulate government business from scrutiny." *See id.* at 202 n.2. If it could, any official could create an end-run around the First Amendment by appending a disclaimer to her account and then using the account as a tool of governance anyway. For this reason, in the related public forum inquiry, courts prioritize objective criteria over government statements of intent that would limit the public's First Amendment rights. *See Hopper v. City of Pasco*, 241 F.3d 1067, 1075–76 (9th Cir. 2001); *Grace Bible Fellowship, Inc. v. Me. Sch. Admin. Dist. No. 5*, 941 F.2d 45, 47 (1st Cir. 1991); *Stewart v. D.C. Armory Bd.*, 863 F.2d 1013, 1021 (D.C. Cir. 1988). Here too, courts should be wary of relying on personal-capacity disclaimers when other evidence points to official use of social media.

II.     **In applying the Supreme Court's state action test, this Court should be mindful of the important role of social media in facilitating public discourse and democratic accountability.**

In light of the critical role that government-operated social media accounts play in communicating important information to the public and in facilitating public discourse, courts should be wary of construing the Supreme Court's state action test too narrowly. Construing the test too narrowly would allow public officials to evade their constitutional obligations by blocking critics or removing evidence of disagreement from nominally personal accounts that are in fact used in furtherance of their official duties.

Social media platforms are indispensable avenues for petitioning the government and for the exchange of core political speech. *See Packingham v. North Carolina*, 582 U.S. 98, 104–05 (2017). Today, government agencies and officials at federal, state, and local levels across the country use social media as one of the primary ways to speak to constituents and other members of the public about policy issues, to make announcements, and to share emergency information.[10] And

---

[10]     *See, e.g., U.S. Digital Registry*, U.S. Gen. Servs. Admin., https://perma.cc/A5E8-B67N (public database showing over 10,000 social media accounts managed by U.S. government agencies, organizations, and programs); Patrick Van Kessel et al., *Congress Soars to New Heights on Social Media* 12, Pew Res. Ctr. (July 16, 2020), https://perma.cc/38AJ-4F9G (describing popularity of social media among members of Congress, governors, and other state officials); *see*

members of the public have seized the opportunity afforded by social media to follow and comment on the thousands of social media accounts run by government officials and agencies.[11] Mirroring traditional town halls and open public meetings, these digital public forums play an important role in self-government and political accountability.

The promise of social media as a tool for democratic engagement is threatened when public officials evade their First Amendment obligations by blocking critics from the social media accounts that they use to further their official duties. As discussed above, it is not uncommon for public officials to choose to use nominally personal accounts even after they assume office. In many cases, these officials use their personal accounts instead of, or alongside, the government-owned accounts associated with their offices, and often these accounts become the primary space for the officials to make announcements, discuss the work of their office, and hear from their constituents.[12] Some officials mix official and personal posts on their nominally

---

*generally* Br. for Elec. Frontier Found. 5–42, *Lindke v. Freed*, 601 U.S. 187 (2024) (No. 22-611).

[11] Van Kessel, *supra* n.10, at 12–13.

[12] Officials who have used these kinds of nominally personal social media accounts include former President Trump, U.S. Representative Alexandria Ocasio Cortez, former Secretary of State John Kerry, and numerous governors and mayors across the country. *See, e.g.*, *Knight First Amend. Inst.*, 928 F.3d 226; Michael Gold, *Ocasio-Cortez Apologizes for Blocking Critic on Twitter*, N.Y. Times, Nov. 4, 2019, https://perma.cc/R5RX-HPKL; Toosi, *supra* n.9 (describing John Kerry's decision

personal accounts. If courts apply the state action test too narrowly in cases like these, officials will have free rein to censor speech and punish disfavored commenters in spaces that in fact function as public forums for speech. This censorship not only punishes an official's critics, it also distorts public discourse.

The Supreme Court's opinion in this case implicitly recognized this problem, noting that public officials who are authorized to speak to the public run the risk of liability for censorship if they mix official and personal posts on one account. *Lindke*, 601 U.S. at 204. Accordingly, where there are close calls, courts should not reflexively defer to an official's post-hoc argument that her account was personal. Instead, courts must carefully conduct the "fact-intensive inquiry" described above, *id.* at 197, respecting the balance the Supreme Court struck between the private speech rights of the official operating the account and the rights of members of the public to see and participate in digital public forums.

III. **Given the differences between the Supreme Court's approach and this Court's previous opinion, this case should be remanded for further discovery and analysis by the district court.**

The state action test articulated by the Supreme Court in *Lindke v. Freed* is significantly broader than the test previously adopted by this Court. To properly

---

to tweet from his nominally personal account because his "pre-existing following was seen as an asset to the State Department").

consider the parties' state action arguments in light of the Supreme Court's test, this case should be remanded to the district court for further factual development and analysis of Freed's authority and his relevant social media posts.

On the first prong, the Supreme Court's decision clarifies that an official's authority to speak on behalf of the government can be derived from written law or custom, and need not be specific to speech via social media. *Id.* at 200–01. This understanding of authority is more capacious than the one suggested by this Court's initial opinion in this case. When previously analyzing Freed's authority, this Court primarily focused on whether there was a law that "compelled Freed to operate his Facebook page" or "a practice tasking Freed with social-media activity." *Lindke v. Freed*, 37 F.4th 1199, 1204–05 (6th Cir. 2022), *vacated*, 601 U.S. 187 (2024). But the record did not permit the Court to consider the customs and practices associated with the role of the city manager. Adequate evaluation of the authority inquiry, as described by the Supreme Court, requires consideration of facts that are not apparent from the record in this case. Facts that would shed light on the authority inquiry include: information about the city manager's job description; evidence from Freed and past city managers about the scope of their job responsibilities; and the custom and practice of Freed and past city managers of speaking to the public on behalf of Port Huron, whether via social media or any other medium. Also relevant is whether the city manager's official website ever linked to Freed's Facebook page—as it

currently does to his X account[13]—or otherwise publicized his Facebook page. Further discovery into and analysis of the posts Lindke would have wished to view is also required to determine whether the subject matter of any of these posts fell within the ambit of Freed's authority as city manager.

On the second prong, the Supreme Court's decision clarifies that the function and appearance of an official's social media page is relevant, *Lindke*, 601 U.S. at 198, 202–03, but this Court previously analyzed only a subset of those considerations that relate to the "use of government resources or state employees," *Lindke*, 37 F.4th at 1206–07. The Supreme Court's decision also clarifies that state action can be found with respect to an account used for both personal and official purposes, *Lindke*, 601 U.S. at 202–03, but this Court previously considered only whether Freed's account as a whole was more consistent with personal or official use, *see Lindke*, 37 F.4th at 1203. Additionally, when blocking operates on a page-wide basis, as it does here, a court must "consider whether [an official] had engaged in state action with respect to any post on which [the blocked individual] wished to comment." *Lindke*, 601 U.S. at 204. To resolve the state action question, then, the parties must develop a factual record showing all of Freed's Facebook posts that Lindke would have wished to view or comment on. A more fulsome record,

---

[13] *See City Manager*, City of Port Huron, https://perma.cc/S339-NT3T.

developed on remand, would allow the district court to better analyze Freed's posts to discern whether he was exercising his authority to speak on behalf of the government.

A "close look," *Lindke*, 601 U.S. at 197, at the relevant set of posts will be especially important in this case, as many of the posts in the record appear consistent with official speech. For example, Freed often posted about how he carried out his job duties. *See, e.g.*, May 30, 2019 Post, R. 28-6, Page ID # 1354 (discussing meetings with CEOs, businesses, and non-profits to encourage more investment in the city); April 12, 2019 Post, R. 28-6, Page ID # 1383 (posting a picture of his office with the caption, "Evening in the office working on the budget"); March 5, 2019 Post, R. 28-6, Page ID # 1407–08 (explaining that the city conducts street evaluations to deploy data-driven road maintenance and construction, and linking to the data for public review). He also frequently made announcements related to the COVID-19 public health crisis that appeared to fall within his ambit as city manager. *See, e.g.*, March 23, 2020 Post, R. 28-6, Page ID # 1208–09 (announcing that playgrounds at the city's parks would be closed based on guidance from healthcare experts and directing followers to "[s]tay home" and "[s]tay safe"); March 16, 2020 Post, R. 28-6, Page ID # 1219 (discussing the City's new meal pick-up program for school children); March 12, 2020 Post, R. 28–6, Page ID # 1223 (discussing the need for local officials to plan for potential community transmission of COVID-19 and

linking to the City's COVID Informational Page).[14] Reevaluating these posts in light of the Supreme Court's guidance—and augmenting the record with information about whether Lindke was prevented from interacting with any of them—is required to determine whether Freed's conduct was attributable to the state.

### Conclusion

For the foregoing reasons, this case should be remanded to the district court with instructions to conduct further discovery and analysis in light of the considerations raised by the Supreme Court's opinion.

June 20, 2024

Respectfully submitted,

/s/ *Stephanie Krent*

David Greene
Sophia Cope
Electronic Frontier Foundation
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
davidg@eff.org

Stephanie Krent
Alexia Ramirez
Katherine Fallow
Knight First Amendment Institute at
    Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
stephanie.krent@knightcolumbia.org

*Counsel for Amici Curiae*

---

[14] There also appear to be a few COVID-related administrative directives that Freed posted to his Facebook page. *See* March 16, 2020 Post, R. 28–6, Page ID # 1220; March 13, 2020 Post, R. 28–6, Page ID # 1222. The current record does not reveal where else—if at all—these directives were publicized.

**Certificate of Compliance**

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this brief complies with the length limitations set forth in this Court's April 30, 2024 Order because it is under thirty pages. I further certify that this brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Microsoft Word in 14-point Times New Roman font, a proportionally spaced typeface.

June 20, 2024                                  /s/ *Stephanie Krent*
                                              Stephanie Krent

                                              *Counsel for Amici Curiae*

**Certificate of Service**

I hereby certify that on June 20, 2024, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record.

June 20, 2024

/s/ *Stephanie Krent*
Stephanie Krent

*Counsel for Amici Curiae*