No. 21-2977

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

_____

KEVIN LINDKE

Plaintiff – Appellant

v.

JAMES R. FREED, in his official and personal capacities

Defendant – Appellee

_____

ON REMAND FROM THE UNITED STATES SUPREME COURT

_____

APPELLEE'S POST-REMAND SUPPLEMENTAL BRIEF

_____

PHILIP L. ELLISON (P74117)
Outside Legal Counsel PLC
Attorney for Plaintiff-Appellant
P.O. Box 107
Hemlock, Michigan 48626
(989) 642-0055
pellison@olcplc.com

TODD J. SHOUDY (P41895)
VICTORIA R. FERRES (P78788)
Fletcher Fealko Shoudy & Francis, PC
Attorneys for Defendant – Appellee
1411 Third Street Suite F
Port Huron, Michigan 48060
(810) 987-8444
tshoudy@fletcherfealko.com
vferres@fletcherfealko.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iii

I.  STATEMENT OF FACTS ......................................................... 1

II.  SUMMARY OF THE ARGUMENT .......................................... 6

III.  ARGUMENT ............................................................................ 8

   A.  Answers to the Court's Questions ................................................. 8

      1.  To what extent does the test articulated in this court's opinion on June 27, 2022, differ from the test articulated by the Supreme Court on March 15 .............................................................. 8

      2.  How does the application of the Supreme Court's test to this case affect the outcome that this court previously reached in this case, if at all? . 14

      3.  In its opinion, the Supreme Court held that an official's social media post may be state action if (1) written law authorized the post, or (2) the post was made pursuant to a "persistent practice[]" that is "so permanent and well-settled that it carries orce of law." Id. at 198–200. ............................................................................................ 19

        a.  How may a plaintiff establish the latter showing in the social media context? ......................................................................... 19

        b.  In other places, the Court's opinion suggests that a post is state action any time the official made it pursuant to his job duties. Id. at 201. Which is the appropriate standard for this court to apply on remand: must there be an affirmative grant of power or a permanent practice empowering the official to make a post? Or does the post's connection to an official job duty suffice? ................................... 21

      4.  Which of Freed's posts, if any, purport to exercise government authority? Which posts, if any, were made pursuant to his official job duties? ............................................................................. 24

5.   Pending before this court is Lindke's motion to remand this case to the district court...........................................................................................29

     a.   Unlike the Sixth Circuit's opinion, the Supreme Court suggested that an account's "apparent" authority to speak on behalf of the government isn't enough to constitute state action. Id. at 198. If this court concludes that the Supreme Court's test is narrower than the test announced in this court's June 2022 opinion, is remand necessary? ......................................................................................29

     b.   The Supreme Court's opinion indicates that, if a state has actually authorized an official to exercise government authority on social media, courts must engage in a fact-intensive, post-by-post analysis to determine which posts purportedly exercise that authority. Id. at 202–03. If this court concludes Freed had authority to post on behalf of the government, should the district court determine which posts exercised that authority in the first instance? ......................32

B.   Amicus Knight First Amendment Institute's Arguments Are Flawed .......35

IV.   CONCLUSION ............................................................................................39

# TABLE OF AUTHORITIES

**Cases**

*Adickes v. S.H. Kress & Co.*,
398 U.S. 144 (1970)................................................................ 10, 19, 37

*Blum v. Yaretsky*,
457 U.S. 991 (1982)........................................................................36

*Garcetti v. Ceballos*,
547 U.S. 410 (2006)........................................................................38

*Griffin v. Maryland*,
378 U.S. 130 (1964)........................................................................10

*Jackson v. Metro. Edison Co.*,
419 U.S. 345 (1974)........................................................................11

*Kennedy v. Bremerton School Dist.*,
597 U.S. 507 (2022).................................................................. 23, 24

*Lane v. Franks*,
573 U.S. 228 (2014).................................................................. 18, 22, 38

*Lindke v. Freed*,
37 F.4th 1199 (6th Cir. 2022) ................................................... passim

*Lindke v. Freed*,
601 U.S 187 (2024)................................................................... passim

*Lindke v. King*,
No. 19-cv-11905, 2023 U.S. Dist. LEXIS 90917 (E.D. Mich. May 24, 2023)......4

*Lindke v. Tomlinson*,
31 F.4th 487 (6th Cir. 2022) ..................................................................5

*Lugar v. Edmondson Oil Co.*,
457 U.S. 922 (1982).......................................................................7, 9

*Monell v. Dep't of Soc. Servs.*,
    436 U.S. 658 (1978) ........................................................................37

*Neuens v. City of Columbus*,
    303 F.3d 667 (6th Cir. 2002) ........................................................34

*Ohio Civil Service Employees Assoc. v. Seiter*,
    858 F.2d 1171 (6th Cir. 1988) ......................................................34

*Peterson v. City of Greenville*,
    373 U.S. 244 (1963) ........................................................................19

*United States v. Seymour*,
    38 F.3d 261 (6th Cir. 1994) ..........................................................34

*United States v. Thomas*,
    272 F. App'x 479 (6th Cir. 2008) ................................................34

*Waters v. City of Morristown*,
    242 F.3d 353 (6th Cir. 2001) ................................................ 11, 30

*Wright v. City of Euclid*,
    962 F.3d 852 (6th Cir. 2020) ........................................................37

## Statutes

MCL § 15.261 ........................................................................................1

## Constitutional Provisions

42 U.S.C. § 1983 ........................................................................ passim

## DEFENDANT/APPELLEE'S POST-REMAND SUPPLEMENTAL BRIEF

NOW COMES Defendant/Appellee James Freed, by and through his attorneys Fletcher, Fealko, Shoudy & Francis, P.C., and files his Post-Remand Supplemental Brief. Defendant/Appellee respectfully requests that this Court affirm the Trial Court's grant of summary judgment to Defendant.

## I. STATEMENT OF FACTS

The facts of this case are not in dispute. James Freed is one of 21 million public sector employees in the United States. Freed was hired as the City Manager of Port Huron (the "City") in 2014. (Mot. for Summ. J., R. 23-2, PageID #670). The City's population is approximately 28,000.[1] The City government is comprised of a Mayor and six Council members, all elected at large. Charter § 2-2(a).[2] Under Michigan law, the City Council conducts business in open meetings that include a public comment period. MCL § 15.261 *et seq*. The meetings are broadcast on public television.

---

[1] *Port Huron City, Michigan*, U.S. Census Bureau, WWW.DATA.CENSUS.GOV, https://data.census.gov/profile?q=Port%20Huron%20city,%20Michigan%20Oneida%20Tribe (last accessed June 27, 2024).

[2] Citations to "City Charter" refer to the City of Port Huron City Charter, which is available at *Charter*, City of Port Huron, WWW.ECODE360.COM, https://ecode360.com/30100704 (last accessed June 27, 2024) and citations to "City Code" refer to the City of Port Huron Code of Ordinances, which is available at *Code of Ordinances*, City of Port Huron, WWW.ECODE360.COM, https://ecode360.com/PO3610 (last visited June 27, 2024).

The City has its own website with links to various departments, including the City Manager.[3]  Members of the public can contact the City departments, including the City Manager, via email.  (Mot. for Summ. J., R. 28-14, PageID #1466, 1468).  The City also operates several Facebook pages, including pages for the "Port Huron Police Department" and "City of Port Huron Parks & Recreation Department," but the City does not have a "City Manager" Facebook page.  (Mot. for Summ. J., R. 23-4, PageID #700-01).  The Port Huron Police Department page expressly states that it is "the official Port Huron Police Department Facebook Page" and contains the Port Huron Police emblem.  (*Id.* at PageID #700).

Prior to 2008, while Freed was enrolled in college at Indiana Wesleyan University, Freed created a personal Facebook account with the name "James Freed" and username @JamesRFreed1.  (Mot. for Summ. J., R. 23-2, PageID #667-668, 670).  The login for the account was jamesfreedfacebook@gmail.com—Freed's personal email account.  (Reply to Mot. for Summ. J., R. 32, PageID #1521).  Freed maintained this personal account while he was employed with the City of Walled Lake, Michigan as the Assistant to the City Manager; the Village of Lakeview, Michigan as the Village Manager; and the City of Stanton, Michigan as the City Manager.  (Mot. for Summ. J., R. 23-2, PageID #676).

---

[3] The City's website is available at City of Port Huron, CITY OF PORT HURON, MI, https://porthuron.org/ (last visited June 27, 2024).

Freed was given an option by Facebook to convert his personal account to a "page" because, as a very active social media user, he was reaching the friend limit of 5,000. (*Id.* at PageID #668-69, 683, Mot. for Summ. J., R. 23-3, PageID #699). All "pages" are generally accessible to the public. (Resp. to Mot. for Summ. J., R. 28-5, PageID #1156). When Freed converted his account, he was required to choose a "category" that described his page. (Mot. for Summ. J., R. 23-2, PageID #684-85). Freed did not elect the other available designations of "Government Official," "Politician," or "Public & Government Service" because none accurately identified his personal account. Freed instead selected "Public Figure." (Mot. for Summ. J., R. 23-2, PageID #670, 684). The "Public Figure" designation can be chosen by anyone creating a Facebook "page." (Mot. for Summ. J., R. 23-2, PageID #684; Reply to Mot. for Summ. J., R. 31-2, PageID #1518).

Freed testified that he only wanted a personal Facebook page, not an official City Manager Facebook page (Mot. for Summ. J., R. 23-2, PageID #679-680). The City did not provide monetary or administrate support for Freed's Facebook page. (*Id.* at PageID #676, 679-80). Freed never accessed his personal Facebook page on a City device. (*Id.* at PageID #676, 679-80).

Freed never issued administrative directives or press releases on his page. (*Id.* at PageID #671). Freed testified "nothing was ever announced on my Facebook that wasn't readily available, either city press releases, newspaper articles, other

information sources, I didn't make announcements like first time you hear it here on my Facebook page." *Id.*; see Mot. for Summ. J., R. 23-9, PageID #795 (January 14, 2020 post at 2:06pm linking to a local newspaper article and stating, "This morning I issued an emergency directive to the Public Works & Fire Departments to begin filling and pre-positioning sandbags to vulnerable property owners."). Moreover, the Director of Public Safety, not the City Manager, releases emergency public information to the media. City Code § 20-15(1).

Prior to March 2020, Petitioner Kevin Lindke, who maintained multiple Facebook profiles with both real and fake names, posted personal attacks on Freed from several of Lindke's Facebook accounts. (Mot. for Summ. J., R. 23-17, PageID #975-76, 1005). Facebook had, in the past, unilaterally removed Lindke's accounts on numerous occasions for violations of its terms of service. (*Id.* at PageID #976). Regarding Lindke's activity on Facebook, Freed testified:

> I just remember one time he wrote like three weird smiley faces, and that was like the first time I saw him on my page. And to be quite honest, I was really creeped out, because I had been aware of other things in this community where he had essentially stalked people, harassed people, lots of PPOs and records. So when I block[ed Lindke], I blocked him not on what he -- because I can't really recall anything he posted. I blocked him specifically on who he was. And I know what he's done in the community to some school employees and other stuff, so I blocked him just on who he was. I can't recall besides the three smiley faces anything that he specifically wrote. [Mot. for Summ. J., R. 23-2, PageID #677-78.[4]]

_____

[4] *Lindke v. King*, No. 19-cv-11905, 2023 U.S. Dist. LEXIS 90917, at **12-20 (E.D. Mich. May 24, 2023) (outlining the history of a PPO entered against Lindke in

Lindke claims he posted comments criticizing Freed on Freed's Facebook page at some point in March 2020. (Mot. for Summ. J., R. 23-17, PageID #980-82). One of these posts was a March 19, 2020 post showing the City Mayor picking up takeout at a local café. (Compl., R. 1-2, PageID #31).



---

2019); *Lindke v. Tomlinson*, 31 F.4th 487, 489-90 (6th Cir. 2022) (outlining the history of another PPO entered against Lindke). Lindke admits he has been "locked [] up a bunch" and that there were bench warrants out for his arrest at the time of his deposition pertaining to PPO matters. (Mot. for Summ. J., R. 23-5, PageID #963, 1005). Lindke would also be convicted of cyberstalking for his 2020 social media activity while this case was pending. L. Fitzgerald, *Kevin Lindke Sentenced to Time Served in Case Involving Facebook Posts*, TIMES HERALD (Nov. 29, 2021, 1:02 PM), *available at* https://www.thetimesherald.com/story/news/2021/11/29/kevin-lindke-sentenced-time-served-case-involving-facebook-posts/8792168002/

Although Freed has no recollection of Lindke's specific comments, Freed deleted Lindke's comments and blocked Lindke from posting on his page. (Mot. for Summ. J., R. 23-2, PageID #677-78). Because Freed had always treated his page "as anyone would their own personal Facebook," Freed had also deleted comments and blocked other users in the past when, for example, he thought a user's comments were "creepy." (*Id.* at PageID #674, 676).

Shortly after this lawsuit was filed on April 6, 2020, Facebook deactivated Freed's account without explanation. (*Id.* at PageID #686). In June 2020, Facebook reactivated the page and then, again without explanation, deactivated it a second time for several months. (*Id.* at PageID #686-87). In October 2020, Facebook unexpectedly reactivated Freed's page. (*Id.* at PageID #687). Freed subsequently unpublished the page, explaining: "If it is not going to be a private page, I don't want it. . . . I wouldn't put photos of my family out there. I wouldn't put photos of my kid out there if I didn't have the ability to control it like a personal page." (*Id.*).

## II.    SUMMARY OF THE ARGUMENT

Government employees and public officials have the right to speak about public affairs in their personal capacities. *Lindke v. Freed*, 601 U.S 187, 203 (2024). The United States Supreme Court adopted a two-prong test for determining whether social media posts by a government official constitute official or private speech, ruling:

We hold that such speech is attributable to the State only if the official (1) possessed actual authority to speak on the State's behalf, and (2) purported to exercise such authority when he spoke on social media. [*Id.* at 191.]

The court explicitly rejected Plaintiff's contention that the appearance and function of the social media activity alone could establish state action. *Id.* at 199, 201.

The first prong of this test is a threshold requirement "grounded in the bedrock requirement that 'the conduct allegedly causing the deprivation of a federal right be *fairly attributable to the State*.'" *Id.* at 194 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)) (emphasis in original). Plaintiff must prove that the defendant had "actual authority rooted in written law or longstanding custom to speak for the State." *Id.* at 201.

The first prong of the Supreme Court test is substantively similar to the test applied by this Court, if not even more restrictive. Because Freed was not authorized to speak on behalf of the City by "any statute, ordinance, regulation, custom, or usage" of the City, Freed's social media posts cannot be state action. 42 U.S.C. § 1983 (2024). This Court previously, and correctly, found Freed's social media posts did not rise to the level of state action. *Lindke v. Freed*, 37 F.4th 1199, 1202 (6th Cir. 2022). The same conclusion is required here, and this Court need not address the second prong.

Should this Court evaluate the posts under the second prong, this Court cannot conclude that Freed was purporting to exercise any authority given to him to speak

on behalf of the City. "[A]n official does not necessarily purport to exercise his authority simply by posting about a matter within it. He might post job-related information for any number of personal reasons, from a desire to raise public awareness to promoting his prospects for reelection." *Lindke*, 601 U.S. at 203. Lindke does not present any evidence that would support a finding that Freed was purporting to exercise authority he had been given when posting on social media.

Finally, remand is not appropriate. Lindke's assertion that the question of state action is a question for the jury has been repeatedly rejected by every court that has considered the issue. As for the suggestion that remand is required for a review of Freed's social media posts, this review was already conducted by the District Court, including the content and context of Freed's posts. (Op. Mot. for Summ. J., R 34, PageID #1531). Accordingly, this Court should once again affirm the District Court's grant of summary judgment.

## III. ARGUMENT

### A. Answers to the Court's Questions

**1. To what extent does the test articulated in this court's opinion on June 27, 2022, differ from the test articulated by the Supreme Court on March 15, 2024?**

#### The Supreme Court's Decision

In *Lindke v. Freed*, the United States Supreme Court was asked to resolve a circuit split and determine under what circumstances a social media post made by a

government official could be considered state action. 601 U.S 187. Where the Sixth Circuit test focused on "whether the official is 'performing an actual or apparent duty of his office,' or if he could not have behaved as he did 'without the authority of his office,'" the Second and Ninth Circuits' test "focus[ed] less on the connection between the official's authority and the account and more on whether the account's appearance and content look official." *Id.* at 194. Ultimately, the Supreme Court ruled:

> When a government official posts about job-related topics on social media, it can be difficult to tell whether the speech is official or private. We hold that such speech is attributable to the State only if the official (1) possessed actual authority to speak on the State's behalf, and (2) purported to exercise such authority when he spoke on social media. [*Id.* at 191.]

The Court was clear that the first prong presented a threshold question. Only if a party established the public official had authority to speak on the State's behalf would the second prong even be evaluated.

To satisfy this threshold requirement, the court must find the conduct to be "'fairly attributable to the State.'" *Id.* at 194 (quoting *Lugar*, 447 U.S. at 937). In determining whether something is "fairly attributable to the state," the Court looks to "any statute, ordinance, regulation, custom, or usage of any state," as identified in Section 1983. 42 U.S.C. § 1983; *Lugar*, 447 U.S. at 937. The Court indicated the sources of power enumerated under Section 1983 could be divided in two categories, including (1) "written law" consisting of statutes, ordinances, and regulations and

(2) custom and usage—which refers to "'persistent practices of state officials'" that are "'so permanent and well settled' that they carry 'the force of law.'" *Lindke*, 601 U.S. at 200 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)). To present a viable claim, a plaintiff must prove that the defendant had "actual authority rooted in written law or longstanding custom to speak for the State." *Id.* at 201. The Court admonished that lower courts must be mindful that while "public officials can act on behalf of the State, they are also private citizens with their own constitutional rights." *Id.* at 196.

As it applies to Freed, the Court ruled, "Freed's conduct is not attributable to the State unless he was 'possessed of state authority' to post city updates and register citizen concerns." *Id.* at 199 (quoting *Griffin v. Maryland*, 378 U.S. 130, 135 (1964)). If "Freed acted in his private capacity when he blocked Lindke and deleted his comments, he did not violate Lindke's First Amendment rights—instead he exercised his own." *Id.* at 197.

**The Sixth Circuit Decision**

This Court began its analysis by stating "Section 1983 provides a cause of action when federal rights are violated by someone acting 'under color of any statute, ordinance, regulation, custom, or usage, of any State.'" *Lindke*, 37 F.4th at 1202 (quoting 42 U.S.C. § 1983). Like the Supreme Court, this Court explained "the ultimate question is whether a defendant's action 'may be fairly treated as that of the

State itself.'" *Id.* at 1203 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)). To make that determination, this Court considered "whether the official is 'performing an actual or apparent duty of his office,' or if he could have behaved as he did 'without the authority of his office.'" *Id.* at 1203 (quoting *Waters v. City of Morristown*, 242 F.3d 353, 359-60 (6th Cir. 2001)). This Court referenced several indicia to consider when making that determination, including whether the text of state law required an officeholder to maintain a social media account, the official uses state resources or staff to run the account, or the account belongs to an office rather than an individual. *Id.* at 1206-07.

## The Tests Are Substantively the Same

The Supreme Court and this Court's tests are substantively the same. Both tests require that the specific conduct being challenged be attributable to authority given by the state. Although there are analytical and semantic differences between the two tests, these differences do not impact the outcome of this case under the Supreme Court's test. For example, the Supreme Court's test makes a point of discussing the meaning of "custom and usage" language in Section 1983 in determining whether Freed "possessed state authority." *Lindke*, 601 U.S. at 200-01. This language in Section 1983 was not discussed in this Court's opinion. This does not reflect a difference in the rulings of the Supreme Court and this Court; rather, it reflects a difference in the roles of the courts. The Supreme Court sought to resolve

a conflict among the circuit courts and announce a test that could be applied by all courts to a variety of circumstances. By contrast, this Court's role was to rule on the appeal presented by Lindke. The reason this Court did not engage in a detailed analysis of "custom and usage" was that Lindke did not argue such as a basis for authority.

Lindke's argument that the Supreme Court's acknowledgement of custom and usage created a "new, wider test" is simply wrong. (Br. 53-25-26). State action must be derived from the text of Section 1983, which by its plain language requires action "under color of any statute, ordinance, regulation, **custom, or usage**." 42 U.S.C. § 1983 (emphasis added). Lindke acknowledged as much in his Complaint. (Compl., R. 1, PageID #3). This Court also acknowledged this in its opinion. *Lindke*, 37 F.4th at 1202. The text of Section 1983 has not changed during the pendency of this lawsuit. The Supreme Court's discussion of the plain language of the statute that has existed in this form for decades is not new.

Another minor difference between the tests is that the Supreme Court focused on whether the public official has authority to speak for the government, whereas this Court focused on whether the public official had actual or apparent authority to speak on social media. In today's digital age of social media, this is essentially the same thing. If a government employee has the authority to speak to the public on

social media about a topic, then that person logically would also have the ability to speak publicly about that topic more generally on other mediums.

Finally, Lindke argues that the Supreme Court's opinion "establishes a new wider test that allows for a finding of state action based on authority" whereas this Court "fram[ed] the issue as one of duty rather than the more broadly based notion of authority." (Br. 53-25). This is nothing more than semantics. Lindke's argument completely overlooks the second part of this Court's test that would have found state action if a public official was (1) performing an actual or **apparent duty**[5] of his office; or (2) he could not have behaved as he did without **the authority** of his office. *Lindke*, 37 F.4th at 1203 (emphasis added).

The Supreme Court's test focused less on duty but also required that the public official have (1) actual authority to speak on behalf of the State on a particular matter, and (2) purported to exercise that authority in the relevant posts. *Lindke*, 601 U.S. at 198. Using Lindke's own theory that "a duty is a strict obligation to act while having the authority is more permissive, and encompasses a wider swatch [sic] of acts" the fact that the Supreme Court did not explicitly reference "duty" is meaningless; if a public official has a duty to act in some fashion, then he obviously has been authorized to take such action. (Br. 53-25). Moreover, the Supreme Court created a narrower viewing of authority by also explicitly requiring courts to

---

[5] See also discussion *infra* in response to Question 5(a).

evaluate whether a government employee was purporting to exercise state authority even if the employee is authorized to speak on the state's behalf, whereas this Court seemed to have assumed that a government employee was purporting to exercise his authority if he possessed it.

In short, the analytical differences between the two tests are not significant and do not impact the outcome of this case.

**2. How does the application of the Supreme Court's test to this case affect the outcome that this court previously reached in this case, if at all?**

### Freed Did Not Have Authority to Speak on Behalf of the City

Application of the Supreme Court's test to this case does not change this Court's previous outcome. Lindke cannot satisfy the first prong of the Court's test. No statute, ordinance, regulation, or custom or usage authorized Freed to speak on the City's behalf.

Freed cannot "conjure the power of the State through his own efforts . . . the presence of state authority must be real, not a mirage." *Lindke*, 601 U.S. at 199. Lindke cannot point to any authority from written law that demonstrates that Freed has "to post city updates and register citizen concerns." *Id.* at 199. The City Manager is inherently not a public-facing position, as the City Manager oversees City administration and "[m]ake[s] recommendations to the City Council concerning the affairs of the City." *Id.* § 5-1(5), (8). This case, therefore, fails on the first prong

of the Supreme Court's test because Lindke has not met his burden of presenting evidence that meets the "threshold showing of authority." *Lindke*, 601 U.S. at 201.

## Freed Did Not Purport to Exercise Governmental Authority

Assuming *arguendo* that Lindke could meet the threshold requirement of authority, then the Court must determine if Freed purported to use that authority. This requires a "fact-specific undertaking in which the post's content and function are the most important considerations." *Id.* at 203. To assess this inquiry, the Supreme Court directed lower courts to evaluate "additional factors" when there is doubt as to whether the public official was purporting to exercise his authority, providing that "an official who uses government staff to make a post will be hard pressed to deny that he was conducting government business." *Id.* at 203. The Supreme Court also found that appearance and function could be relevant to this inquiry. *Id.* at 198.

This Court and the District Court already engaged in this analysis. The District Court applied a fourteen-factor test to evaluate whether Freed had "acted under color of state law in maintaining the social media account." (Op. Mot. for Summ. J., R. 34, PageID #1531). The District Court explained:

> A non-exhaustive list of factors that courts have considered in making this determination include: (i) how the public official describes and uses the page; (ii) how others, including government officials and agencies, regard and treat the page; (iii) whether the public official is identified on the page with the public position he or she holds (such as through the title of the page or cover or profile photos); (iv) whether the public

official uses the page to announce official business; (v) how the page is categorized (as either a "government official" or a "public figure"); (vi) whether the page includes governmental contact information; (vii) **whether posts are expressly addressed to constituents; (viii) whether the public official solicits comments or invites constituents to have discussions on the page; (ix) whether the content posted relates to official responsibilities and business conducted in an official capacity**; (x) to whom features of the page are made available; (xi) the use of government resources, including government employees, to maintain the page; (xii) whether creating the account is one of the public official's enumerated duties; (xiii) whether the account will become state property when the public official leaves office; and (xiv) whether the public official's social media activity takes place during normal working hours. [*Id.* at 1531 (emphasis added).]

The test applied by the District Court included consideration of the content and context of individual posts. (*Id.* at PageID #1535). The District Court specifically found that Freed did not solicit back-and-forth conversations on his posts and that the content had a strong tendency towards Freed's family life. (*Id.* at PageID #1536).

Not only did the District Court consider individual posts, but the District Court also considered additional factors identified by the Supreme Court, including whether an official "uses government staff to make a post." *Lindke*, 601 U.S. at 203. The District Court found that Freed did not use government resources or employees to post on his Facebook page, which "contrasts notably" with the City's other Facebook pages. (Op. Mot. for Summ. J., R 34, PageID #1535). This Court similarly evaluated whether government funds, government resources, or government employees were used when Freed was posting on Facebook. *Lindke*,

37 F.4th at 1205-06. Like the District Court, this Court found that none of these factors were applicable to Freed's Facebook posts. *Id.*

Both Courts also analyzed the appearance and function of Freed's Facebook posts, and both Courts found that appearance and function did not support a finding of state action. The District Court found that Freed's posts were "overwhelming[ly] personal [in] nature and lack[ed] official trappings," reasoning that Freed's username was not connected to his position, the title of the page did not include Freed's official title, the page was not designated as a "government official" page, the account was not registered to the City, the page would not become state property when Freed was no longer employed by the City, and purely private individuals could also include a link to the government website on his or her page. (Op. Mot. for Summ. J., R. 34, PageID #1535-1536). Although this Court focused on duty and authority in its test, it nevertheless analyzed the appearance and function of Freed's posts and found that the presentation factor was insufficient to constitute state action. *Lindke*, 37 F.4th at 1206.

Lindke incorrectly suggests the Supreme Court found that Freed's account was a "mixed use" account.[6] (Br. 53-36). The Supreme Court never found that Freed's account was a mixed-use account. While discussing the potential use of

---

[6] Apparently in support of this argument, Lindke asserts with no evidence or explanation that there were "several state actor posts." (Br. 53-39).

disclaimers, the Court indicated that when a party does not designate their account as "either 'personal' or 'official'" it raises "the prospect that it was 'mixed use'—a place where he made some posts in his personal capacity and others in his capacity as city manager." *Lindke*, 601 U.S. at 202. However, there is absolutely no evidence demonstrating that Freed made any posts in his capacity as city manager. It is undisputed "Freed posted prolifically (and primarily) about his personal life." *Id.* at 192. Freed also posted information that he learned through his public employment. However, the Supreme Court held public officials may engage "in private speech 'relate[d] to his public employment" or 'concern[ing] information learned during that employment'" without engaging in state action. *Id.* at 203 (quoting *Lane v. Franks*, 573 U.S. 228, 238 (2014)). Posts about information Freed learned through his public employment did not turn Freed's posts into a "mixed use" social media account.

Application of the Supreme Court's test does not alter the outcome of this case—Freed's Facebook posts were made in his personal capacity, and this Court correctly found such did not constitute state action.

**3. In its opinion, the Supreme Court held that an official's social media post may be state action if (1) written law authorized the post, or (2) the post was made pursuant to a "persistent practice[]" that is "so permanent and well-settled that it carries force of law." Id. at 198–200.**

    **a. How may a plaintiff establish the latter showing in the social media context?**

For custom or usage to exist under 42 U.S.C. § 1983, a plaintiff must establish that there is a custom that is so permanent and well-settled that it carries force of law because the state itself has "compelled the act." *Adickes*, 398 U.S. at 167-68, 171. "When the State has commanded a particular result, it has saved to itself the power to determine that result and thereby 'to a significant extent' has 'become involved' in it." *Peterson v. City of Greenville*, 373 U.S. 244, 248 (1963). In the context of government employees' public speech on social media, the Supreme Court held that a custom of an employee speaking on behalf of the government must be longstanding to constitute state action. *Lindke*, 601 U.S. at 199-200. The Supreme Court explained that "a city manager like Freed would be authorized to speak for the city . . . if . . . prior city managers have purported to speak on its behalf and have been recognized to have that authority for so long" that the manager's authority has become 'permanent and well settled.'" *Id.* (quoting *Adickes*, 398 U.S. at 168).

Lindke answers this question by arguing that a plaintiff can establish a custom by the Court engaging in the "'fact-specific undertaking' where each post's 'content and function' are the 'most important' considerations." (Br. 53-29). Lindke furthers

his argument by pointing the Court to several of Freed's Facebook posts that he alleges show that the post's content and function are in furtherance of official responsibilities. (Br. 53-29). Lindke completely misses the mark here. While those arguments could potentially support the second prong of the Supreme Court's test when evaluating whether a public official purported to exercise government authority, they are irrelevant to the question of how a plaintiff could show a longstanding custom or usage that is equivalent to a written law as it relates to an employee speaking on behalf of the State.[7] Moreover, the Court was very clear that a court can never even reach the second question unless it first finds state authority exists. *See Lindke*, 601 U.S. at 201.

An example of when a plaintiff could establish that a custom exists is where city managers for decades have held yearly town hall events centered on announcing updates on parks and recreation events within the city at the city hall. There is no written law, ordinance, or regulation requiring city managers to speak to the public about updates on parks and recreation, and at first blush it may not seem as though this would be a topic within the city managers' "bailiwick." This would be an example of persistent practice. The current city manager holds the town halls as a continuation of what previous city managers did for the last twenty years, and the

---

[7] See also discussion *infra* in [Section B]{.underline} in response to Amicus Knight First Amendment Institute's arguments.

mayor and other city council members regularly attend such events. Due to the increasing use and convenience of virtual meetings in other areas of city governance, the city manager decides to simultaneously stream the town hall on Facebook live on his personal Facebook page.

The evidence that the town halls on the specific topic of parks and recreation updates had been held by the other city managers for the last twenty years and that city council and the mayor regularly attended such event demonstrates that the authority of the city manager to speak about park and recreation updates at the town halls was so permanent and well-settled that it became akin to a legal institution— in person and now on social media. *See id.* at 200. The Court would then need to analyze whether the city manager purported to exercise governmental authority. No such evidence exists here.

> **b. In other places, the Court's opinion suggests that a post is state action any time the official made it pursuant to his job duties. Id. at 201. Which is the appropriate standard for this court to apply on remand: must there be an affirmative grant of power or a permanent practice empowering the official to make a post? Or does the post's connection to an official job duty suffice?**

This Court's question regarding a "post's connection to an official duty" appears to originate from the following statement from the Supreme Court:

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006). This right includes the ability to speak about "information related to or learned through public employment," **so long as the speech is not "itself ordinarily within the scope of [the] employee's duties.** *Lane v. Franks*, 573 U.S. 228, 236, 240. [*Lindke*, 601 U.S. at 197 (emphasis added).]

In this portion of the Opinion, the Court was explaining that public employees, like Freed, have the same right to speak on matters of public concern as their private sector counterparts, including information related to or learned through public employment. The Court noted there is an exception to this rule, where "the speech . . . itself" is "ordinarily within the scope of the employee's duties." *Id.* at 197 (quoting *Lane*, 573 U.S. at 228, 236, 240)). The Court was not saying there is an exception for posts that might relate to an employee's job duties. Rather, the exception arises where the State has authorized a public employee as part of the employee's duties to speak on behalf of the State AND the speech itself is within the employee's duties. The Supreme Court also illustrated this point by discussing an example of "the director of the state transportation department" with "broad responsibility for the state highway system that, in context, **includes authority to make official announcements on that subject**." *Id.* at 200-01 (emphasis added). This section of the Opinion does not create a separate test, as the operative question remains whether the State has authorized the employee to speak on the State's behalf.

An example highlights this distinction. A city fire chief is authorized by city ordinance to speak to the public about arson investigations, but a probationary firefighter working for the city is not. Both post to social media about responding to a suspicious fire. The speech by the fire chief could satisfy the first prong of the Supreme Court's test, not because the post is related to the fire chief's job duties, but because his job duty as defined by the ordinance includes speaking to the public on such issues. The same or similar social media post made by a probationary firefighter would be purely private speech, even though the subject of the post relates to the firefighter's job duties, because speech itself was not within the firefighter's job duties.

The "inquiry is not whether making official announcements *could* fit within the job description, it is whether making official announcements is *actually* part of the job that the State entrusted the official to do." *Id.* at 201 (emphasis in original). Citing *Kennedy*, the Supreme Court admonished that "courts must not rely on 'excessively broad job descriptions' to conclude that government employee is authorized to speak for the State." *Id.* (citing *Kennedy v. Bremerton School Dist.*, 597 U.S. 507, 529 (2022)).

In *Kennedy*, the Supreme Court was called upon to evaluate whether a football coach was engaged in private speech or government speech when he engaged in post-game prayers. Like Lindke in the instant case, the school district argued that

"Mr. Kennedy served as a role model 'clothed with the mantle of one who imparts knowledge and wisdom'" and remained on duty after games. *Kennedy*, 597 U.S. at 530. The Supreme Court rejected this argument, explaining "this argument commits the error of positing an 'excessively broad job descriptio[n]' by treating everything teachers and coaches say in the workplace as governmental speech subject to government control." *Id.* at 530-31. Lindke makes the same error in this case.

4. **Which of Freed's posts, if any, purport to exercise government authority? Which posts, if any, were made pursuant to his official job duties?**

**Freed Did Not Purport to Exercise Governmental Authority in his Posts**

There are no posts on Freed's Facebook page where he purported to exercise governmental authority or that were made pursuant to his official job duties. Freed plainly testified: "nothing was ever announced on my Facebook that wasn't readily available, either city press releases, newspaper articles, other information sources, I didn't make announcements like first time you hear it here on my Facebook page. . . . . I would take information from other parts of the community, sources and stuff and put it out there." (Mot. for Summ. J., R. 23-2, PageID #679-80).

Lindke points the Court to several posts wherein he claims Freed made posts pursuant to his official job duties.[8] Lindke includes the following posts:

---

[8] Lindke had access to and could have commented on each one of these posts given that he was not blocked from Freed's Facebook page until March 19, 2020; as such, these posts cannot provide a basis for this action.

- March 16, 2020 – sharing of an administrative directive directed to the City Engineer regarding drive-thru and pickup lanes (Br. 53-31).
- March 13, 2020 – sharing of an administrative directive directed to the Finance Director and City Treasurer regarding water shutoffs (Br. 53-33).
- March 9, 2020 – photograph of Freed's daughter in a wagon with their family dog with the caption, "All I wanted for my birthday today was to take a walk with these two" (Br. 53-34).
- March 4, 2020 – photographs of a press conference that occurred earlier in the day where the Port Huron Mayor announced the completion of the "Reduce and Restructure Strategy" (Br. 53-35).
- January 29, 2020 – photograph of Freed attending a State of Michigan State of the State address with county officials (Br. 53-36).
- March 4, 2020 – post about a sign in the City (Br. 53-37).

At best, two of these posts involve self-promotion, i.e. private speech. Lindke argues that the March 9, 2020 post including a photograph of Freed's daughter and dog in his home driveway "could arguably not be state action (unless done for retail politics to the general public)." (Br. 53-34-35). In the January 29, 2020 post, Freed shares a photograph of "[t]he crew at the State of the State address." (Br. 53-36). Lindke argues that Freed is purporting to exercise government authority in that post because he is "[p]ublicly flouting [his] connections and access for *political* advantage." (*Id.*). This is absurd. The Supreme Court expressly held that posts of this nature are private: "[Freed] might post job-related information for any number of personal reasons, from a desire to raise public awareness to promoting his prospects for reelection." *Lindke*, 601 U.S. at 203. If these posts could even "arguably" constitute state action, especially for a non-elected government

employee, a significant amount of government employees' online speech would be chilled.

The March 4, 13, and 16, 2020 posts are the quintessential examples of when a government employee is sharing information learned through his public employment and, thus, engaged in private speech. In two of the posts, Freed shares administrative directives that Freed issued earlier in the day. (Br. 53-31, 33). In the other post, he posts a photograph of a sign welcoming drivers to the City that had recently been illuminated. (Br. 53-37).

These posts are nearly identical to the latter of the following two examples in the Supreme Court's decision:

> Take a mayor who makes the following announcement exclusively on his Facebook page: "Pursuant to Municipal Ordinance 22.1, I am temporarily suspending enforcement of alternate-side parking rules." The post's express invocation of state authority, its immediate legal effect, and the fact that the order is not available elsewhere make clear that the mayor is purporting to discharge an official duty. If, by contrast, the mayor merely repeats or shares otherwise available information— for example, by linking to the parking announcement on the city's webpage—it is far less likely that he is purporting to exercise the power of his office. Instead, it is much more likely that he is engaging in private speech "relate[d] to his public employment" or "concern[ing] information learned during that employment. [*Lindke*, 601 U.S. at 203].

The latter part of that example is true in the March 4, 13, and 16, 2020 posts. Freed was clear that he never issued administrative directives on his page. (Mot. for Summ. J., R. 23-2, PageID #671). The action in the posts was taken when Freed gave the directives to the City Engineer, City Finance Director, and City Clerk. The

information in the posts is available in other locations. (Mot. for Summ. J., R. 23-2, PageID #671). In the March 4, 2020 post, anyone could drive by the sign and see that it was illuminated again. Freed was not purporting to exercise government authority when talking about his job or reverberating messages publicly online—he could have done the same publicly in church or at the grocery store.

## Further Record Development Is Futile

Lindke argues that "[f]urther record development is needed, including access to the posts themselves," to determine which posts, if any, Freed purported to exercise government authority and suggests that the posts should be "retrieved from Facebook's servers via a federal subpoena." (Br. 53-39 & n. 12). The first issue with this argument is that Lindke has had access to all posts made on Freed's account since they were produced by Freed **four years ago** on June 30, 2020. After the District Court granted Freed summary judgment and Lindke appealed to this Court, Lindke had every incentive to discuss any and all posts that supported Lindke's claim that Freed was purporting to exercise state authority when posting on social media in the initial appeal. In fact, Lindke did exactly that in his initial appeal brief, identifying and discussing individual posts by Freed. (Initial Br., 12-7, 37-41, 44, 45-46).

The second fatal issue with Plaintiff's argument is that a federal subpoena to Facebook to obtain account contents is prohibited by federal law. See the Stored

Communications Act, 18 U.S.C. § 2701 *et seq.* Instead, "[p]arties to litigation may satisfy party and non-party discovery requirements relating to their Facebook accounts by producing and authenticating the content of communications from their accounts by using the 'Download Your Information' tool . . ."[9]

Lindke requested that Freed use the "Download Your Information" tool and produce the same, which Freed did in his Rule 26 Disclosures at the onset of this litigation on June 30, 2020. Freed's Facebook account has been deactivated since approximately the same time because, as Freed testified, "If it is not going to be a private page, I don't want it." (Mot. for Summ. J., R.23-2, PageID #679-680, 687). There is no further information about which discovery is needed, and Lindke's proposed "federal subpoena" would be futile.

The Courts cannot be expected to go on a fishing expedition disguised as a "fact-intensive, post-by-post analysis" when Lindke cannot even point this Court to a single post wherein Freed is purporting to exercise government authority despite having had access to several hundred of Freed's Facebook posts for nearly four

---

[9] Facebook's Help page answers "May I obtain any account information or account contents using a subpoena?" by stating that "Federal law does not allow private parties to obtain the content of communications (example: messages, timeline posts, photos) using subpoenas." Facebook, *May I Obtain Any Account Information or Account Contents Using a Subpoena?*, WWW.FACEBOOK.COM, https://www.facebook.com/help/133221086752707/?helpref=uf_share (last visited June 27, 2024).

years.  It was incumbent upon Lindke to raise such issues to this Court's attention.

Lindke has not made a showing of state action.

> **5. Pending before this court is Lindke's motion to remand this case to the district court.**
>
>> **a. Unlike the Sixth Circuit's opinion, the Supreme Court suggested that an account's "apparent" authority to speak on behalf of the government isn't enough to constitute state action. Id. at 198. If this court concludes that the Supreme Court's test is narrower than the test announced in this court's June 2022 opinion, is remand necessary?**

Remand to the District Court is not required in the instant case, as the first prong of the Supreme Court's test sets forth a narrower interpretation of state action than that applied by the Sixth Circuit.  The Supreme Court held that "a public official's social-media activity constitutes state action under Section 1983 only if the official (1) possessed actual authority to speak on the State's behalf, and (2) purported to exercise that authority when he spoke on social media." *Lindke*, 601 U.S. at 198.  The Court was adamant that the first prong of this test was a threshold requirement "grounded in the bedrock requirement that 'the conduct allegedly causing the deprivation of a federal right be *fairly attributable to the State.*'" *Id.* at 194 (quoting *Lugar*, 457 U. S. at 937) (emphasis in original).  State action requires that the action "is traceable to the State's power or authority"; no "[p]rivate action, "no matter how 'official' it looks" can constitute state action.  *Id.*

The Supreme Court rejected Plaintiff's contention that the appearance and function of the social media activity alone could establish state action. The Court explained the appearance and function is only relevant for the second prong of the analysis but "cannot make up for a lack of state authority at the first," explaining:

> Lindke's focus on appearance skips over this crucial step. He insists that Freed's social-media activity constitutes state action because Freed's Facebook page looks and functions like an outlet for city updates and citizen concerns. But Freed's conduct is not attributable to the State unless he was "possessed of state authority" to post city updates and register citizen concerns. *Griffin*, 378 U. S., at 135, 84 S. Ct. 1770, 12 L. Ed. 2d 754. If the State did not entrust Freed with these responsibilities, it cannot "fairly be blamed" for the way he discharged them. *Lugar*, 457 U. S., at 936, 102 S. Ct. 2744, 73 L. Ed. 2d 482. Lindke imagines that Freed can conjure the power of the State through his own efforts. Yet the presence of state authority must be real, not a mirage. . . . . To establish state action, plaintiff must demonstrate the defendant had "actual authority rooted in written law or longstanding custom to speak for the State." "If the plaintiff cannot make this threshold showing of authority, he cannot establish state action." [*Id.* at 199, 201.]

By comparison, the Sixth Circuit "state-official test" asked two questions: (1) "whether the official is 'performing an actual or apparent duty of his office'" or (2) "if he could not have behaved as he did 'without the authority of his office.'" *Lindke*, 37 F.4th at 1203 (quoting *Waters*, 242 F.3d at 359). In the context of a social media account, an official's activity may be state action where (1) it is part of the official's actual **or apparent** duties, or (2) the activity could not happen in the same way without the authority of the office. *Id.* at 1204-05 (emphasis added).

Although the exact parameters of what was considered an "apparent duty" was not explored in the Sixth Circuit's opinion, to the extent "apparent duty" contemplated consideration of the appearance of Freed's actions, this Court's test is broader than the Supreme Court's ruling requiring "actual authority." As the Supreme Court explained, the "inquiry is not whether making official announcements *could* fit within the job description, it is whether making official announcements is *actually* part of the job that the State entrusted the official to do." *Lindke*, 601 U.S. at 201 (emphasis in original). Accordingly, if Freed's conduct did not constitute state action under the Sixth Circuit test, then it could not be considered state action under the more restrictive first prong of the Supreme Court test.

While this Court appears to have adopted a broader test of what would be considered authority, this Court applied such in a narrow manner, focusing on whether "running a social-media account" was part of Freed's "actual or apparent duty." *Lindke*, 37 F.4th at 1204. In applying its narrow test of actual authority, the Supreme Court said the proper question was whether the "official has authority to speak for the State." *Lindke*, 601 U.S. at 200. Where an official has authority to speak for the State, the official "may have authority to do so on social media even if the law does not make that explicit." *Id.*

However, the Supreme Court's modification of this question does not necessitate a remand, as both parties already argued the scope of Freed's authority

to speak on behalf of the City. In the initial appeal, Lindke incorrectly argued that Freed's "actual or apparent" job duties included "communicating to the public" under the City Charter and City Manager webpage. (Initial Br. 12-36, 43). The mere fact that Freed's job duties **could** have included communicating with the public is not sufficient to establish state action; rather, Plaintiff needed to establish that "making official announcements is **actually part**" of Freed's job. *See Lindke*, 601 U.S. at 201. Plaintiff simply has not and cannot make that showing.

    **b. The Supreme Court's opinion indicates that, if a state has actually authorized an official to exercise government authority on social media, courts must engage in a fact-intensive, post-by-post analysis to determine which posts purportedly exercise that authority. Id. at 202–03. If this court concludes Freed had authority to post on behalf of the government, should the district court determine which posts exercised that authority in the first instance?**

The Supreme Court indicated that if the first prong of its test has been established, i.e. the public official "possessed actual authority to speak on the State's behalf," then a court must next evaluate whether the public official "purported to exercise such authority when he spoke on social media." *Id.* at 191. This second prong of the test asks whether the public employee was using "speech in furtherance of his official responsibilities" or "speaking in his own voice." *Id.* at 201. In making this determination, the Supreme Court admonished the courts that a public employee does not exercise authority to speak on the state's behalf simply by posting about matters within his authority. *Id.* at 203.

Hard-to-classify cases require awareness that **an official does not necessarily purport to exercise his authority simply by posting about a matter within it**. He might post job-related information for any number of personal reasons, from a desire to raise public awareness to promoting his prospects for reelection. Moreover, many public officials possess a broad portfolio of governmental authority that includes routine interaction with the public, and it may not be easy to discern a boundary between their public and private lives. Yet these officials too have the right to speak about public affairs in their personal capacities. See, *e.g.*, *id.*, at 235-236, 134 S. Ct. 2369, 189 L. Ed. 312. Lest any official lose that right, **it is crucial for the plaintiff to show that the official is purporting to exercise state authority in specific posts**. And when there is doubt, additional factors might cast light—for example, an official who uses government staff to make a post will be hard pressed to deny that he was conducting government business. [*Id.* (emphasis added)].

While the Supreme Court has indicated that "posts that appear on an ambiguous page" like Freed's page will require "a fact-specific undertaking in which the post's content and function are the most important considerations," *id.* at 203, such does not require remand in the instant case, as this test has already been completed by the District Court and this Court.[10]

Remand is also not necessary for two practical reasons. First, Lindke argues that "resolution of factual disputes between Plaintiff and Defendant on individual posts rests with the Lindke jury, not this Court." (Br. 53-40). Lindke is wrong; the question of state action does not go to the jury, which this Court correctly concluded in its initial Opinion. *Lindke*, 37 F.4th at 1202 n.1; *Neuens v. City of Columbus*, 303

---

[10] See also discussion in response to Question 2, *supra*.

F.3d 667, 670 (6th Cir. 2002) ("Whether an individual acted under color of state law is a question of law for the Court.").

Second, questions of law do not require remand. *See Ohio Civil Service Employees Assoc. v. Seiter*, 858 F.2d 1171, 1178 (6th Cir. 1988) ("As this is a pure question of law, we need not remand this question to the district court."); *United States v. Thomas*, 272 F. App'x 479, 487 (6th Cir. 2008) (citing *United States v. Seymour*, 38 F.3d 261, 264 (6th Cir. 1994)) (Courts of Appeal need not remand when they "may answer such a question of law ourselves"). This is likely why this Court did not remand to the District Court after applying a test different from the District Court initially. This Court should also decline to do so here.

Moreover, as a practical matter, if summary judgment is denied in the District Court, the state action inquiry will ultimately come to this Court for a de novo review, potentially in an interlocutory appeal. *Neuens*, 303 F.3d at 670 (in an interlocutory appeal, "[h]aving jurisdiction over the qualified immunity issue also entitles us to review whether *Neuens* put forth a prima facie § 1983 claim. . . . Because there is no indication in the record that Defendant-Appellant was acting under color of law at the time of the incident, we also conclude that the district court erred in denying Officer Bridges' summary judgment motion."). A remand to the District Court is, therefore, merely academic in nature. This Court should not take

such an unnecessary step, especially in a case that has been litigated for four years with potential attorneys' fees under 42 U.S.C. § 1988(b).

## B. Amicus Knight First Amendment Institute's Arguments Are Flawed

Issues raised by Amicus Knight First Amendment Institute (the "Amicus") require response. Amicus argues that authority can be found when "the official is authorized to speak on behalf of the government generally." (Amicus Br. 55-11). The Amicus's assertion greatly exceeds the scope of the Court's opinion. Instead, "[t]he inquiry is not whether making official announcements *could* fit within the job description; it is whether making official announcements is *actually* part of the job that the State entrusted the official to do." *Lindke*, 601 U.S. at 201.

Amicus continues that "[i]n cases involving high-ranking officials, like elected representatives and agency heads who have broad authority and public-facing roles, this question will usually be answered in the affirmative," providing examples such as the President of the United States, a mayor, and an elected sheriff. (Amicus Br. 55-11). This contradicts the example provided by the Supreme Court of when authority exists: "state law might grant a high-ranking official like the director of the state department of transportation broad responsibility for the state highway system that, in context, includes authority to make official announcements on that subject." *Lindke*, 601 U.S. at 200-01. The Supreme Court's example is much narrower, as the director of the state department of transportation's speech about the

state highway system is "within [his] bailiwick," as opposed to the Amicus's example that concludes that a "high-ranking" official automatically has broad authority and can be found to speak on behalf of the state apparently on any topic. Amicus Br. 55-11; *Lindke*, 601 U.S. at 199 ("If public health is not within the portfolio of the city manager, then neither the post nor the deletions would be traceable to Freed's state authority—because he had none. . . . Lindke must show more than that Freed had *some* authority to communicate with residents on behalf of Port Huron. The alleged censorship must be connected to speech on a matter within Freed's bailiwick. . . . There must be a tie between the official's authority and 'the gravamen of the plaintiff's complaint.'" (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1003-04 (1982))).

This largely mirrors this Court's analysis regarding apparent duties: "Take an example involving state funds. A city councilwoman is given a budget for community outreach efforts. She spends some of that budget to pay for her account on a paid social-media platform, or for paid features (like ads) on a free platform. Here, her use of state funds to pay for the account suggests that operating the account is within her job duties—and thus, state action." *Lindke*, 37 F.4th at 1204. In both cases, the public employee is granted authority over specific subject matter that is, therefore, within his or her bailiwick. The inquiry is still whether the state "actually"

entrusted the government employee to speak on its behalf on the subject matter—not whether it "could" have. *Lindke*, 601 U.S. at 201 (emphasis in original).

Further, Amicus's argument that "[e]vidence of the official's own practices" can constitute a custom and citation to several cases involving municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)[11] without looking to whether such custom was longstanding are completely inconsistent with the Supreme Court's decisions in *Adickes* and *Lindke*. (Amicus Br. 55-14, 17). In *Adickes*, the Supreme Court explicitly held that in the Section 1983 context, "the relevant inquiry is whether at the time of the episode in question there was a **longstanding** and still prevailing state-enforced custom." 398 U.S. at 173 (emphasis added). In *Lindke*, the Court reaffirmed *Adickes* by explaining the practice had to have existed "for so long" that it has become "permanent and well settled" in the Section 1983 context. 601 U.S. at 200 (quoting *Adickes*, 398 U.S. at 168). The Court's example re-affirmed the necessity of longstanding custom in finding state action, finding that "a city manager like Freed would be authorized to speak for the city . . . if . . . **prior city managers have purported to speak** on its behalf and have been recognized to have that authority **for so long**" that the manager's authority has

---

[11] Municipal liability under *Monell* is a distinct inquiry and, furthermore, is a jury question, while state action is a question of law that ultimately will be for this Court to decide even if it is eventually reviewed de novo on appeal. *See Wright v. City of Euclid*, 962 F.3d 852, 880-81 (6th Cir. 2020).

become 'permanent and well settled.'" *Id.* (quoting *Adickes*, 398 U.S. at 168) (emphasis added).

Finally, Amicus argues that "the government may have a stronger interest in regulating private speech" of government employees. (Amicus Br. 55-17-18). This is an inaccurate statement of the law. Unlike a private actor, a local government cannot "leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens." *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006). The Supreme Court in *Lindke* confirmed the state action doctrine is limited "for good reason"—as "act of officers in ambit of their personal pursuits" are shielded from liability because government employees are "private citizens with their own constitutional rights." 601 U.S. at 196 (quoting *Screws v. United States*, 325 U.S. 91, 111 (1945)).

Accordingly, a government employee's speech is not transformed into government speech merely because it "concerns information acquired by virtue of his public employment." *Lane*, 573 U.S. at 240 (citing *Garcetti*, 547 U.S. at 421). If state action existed every time a government employee posted publicly on social media about something connected to his or her job duties, it would significantly impair the government employee's free speech rights. A government employee should not be stripped of his personal liberties simply by virtue of his title, and he

should not have to exchange his First Amendment rights to accept public employment.

## IV.    CONCLUSION

Defendant respectfully requests this Court affirm the District Court's grant of summary judgment to Defendant.

FLETCHER FEALKO
SHOUDY & FRANCIS, P.C.
Attorneys for Defendant/Appellee

By:  /s/ Victoria R. Ferres
     VICTORIA R. FERRES
1411 Third Street, Suite F
Port Huron, Michigan  48060
Michigan Bar #78788
DATED:  June 28, 2024          vferres@fletcherfealko.com

# CERTIFICATE OF COMPLIANCE

The undersigned certifies that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief, including headers and footnotes, contains less than forty (40) pages as ordered by this Court, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word Version 2016 and Times New Roman font sized 14 point.

Respectfully Submitted,

FLETCHER FEALKO
SHOUDY & FRANCIS, P.C.
Attorneys for Defendant-Appellee

By: /s/ Victoria R. Ferres
1411 Third Street, Suite F
Port Huron, Michigan 48060
(810) 987-8444
Michigan Bar #78788
vferres@fletcherfealko.com

Dated: June 28, 2024

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon all parties to the above cause on June 28, 2024 by electronic filing.

Respectfully Submitted,

FLETCHER FEALKO
SHOUDY & FRANCIS, P.C.
Attorneys for Defendants-Appellees

By: /s/ Victoria R. Ferres
1411 Third Street, Suite F
Port Huron, Michigan 48060
(810) 987-8444
Michigan Bar #78788
vferres@fletcherfealko.com

Dated: June 28, 2024